FERGUSON, Appellant;

Cannon et al., Appellees,

v.

DYER et al., Appellees.

[Cite as *Ferguson v. Dyer*, 149 Ohio App.3d 380, 2002-Ohio-1442.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 01AP–619.

Decided March 28, 2002.

Palmer, Volkema, Thomas, L.P.A., Michael S. Miller, Robert G. Palmer and Elizabeth S. Burkett, for appellant.

Reminger & Reminger Co., L.P.A., Gwenn S. Karr and Elisabeth D. Gentile, for appellees.

DESHLER, Judge.

{¶ 1}  Plaintiff-appellant, Karen S. Ferguson, appeals from a judgment of the Franklin County Court of Common Pleas in favor of defendants-appellees Howard L. Dyer, D.O., and his employer Victorian Village Internal Medicine, Inc.

{¶ 2}  This case rests upon allegations of medical negligence brought by Karen S. Ferguson and her two children against appellees and Doctors Hospital. Ferguson, then thirty-three weeks pregnant, presented at the emergency room of Doctors Hospital West in Columbus, Ohio, on February 26, 1997, because she was having difficulty breathing.  Ferguson was initially sent home, but ultimately was returned to the emergency room by an emergency squad later that day.  She gave birth to a baby girl by emergency cesarean section that evening.  Diagnosed

with acute respiratory distress, Ferguson was intubated, placed on a ventilator, and admitted to the Intensive Care Unit ("I.C.U.") at Doctors Hospital with appellee Dr. Harold L. Dyer as her attending physician.

{¶ 3} On the morning of February 28, 1997, Dr. Dyer reviewed chest X-rays of Ferguson, examined her, and assessed her condition in part upon an index known as the "rapid shallow breathing index." Based upon the results of Dr. Dyer's evaluation, he concluded that Ferguson had responded well to treatment and could be taken off the ventilator and her endotracheal tube removed. Pursuant to Dr. Dyer's orders, Ferguson was accordingly extubated at approximately 9:05 a.m. on February 28, 1997, by a respiratory therapist. Ferguson nonetheless remained in the I.C.U. and was given oxygen via a nasal canula. Nurse Robin Hilleary, a registered nurse and employee of Doctors Hospital, was the nurse assigned to care for Ferguson on that day. Dr. Stephen C. Milburn, a third-year resident in internal medicine, was the resident on duty at the I.C.U.

{¶ 4} Through the course of the morning after being extubated, Ferguson appeared to be doing well. No significant changes in heart rate, respiration, or blood pressure were noted. Her obstetrician examined her, and her newborn daughter was brought to visit at approximately 11:30 a.m.

{¶ 5} At approximately noon of the following day, February 29, 1997, Ferguson developed renewed difficulty in breathing. Her vital signs deteriorated. Dr. Dyer was not called regarding this change in Ferguson's condition; however, Dr. Milburn was paged at approximately 12:15 p.m. Upon his arrival at the I.C.U., Dr. Milburn attempted to reintubate Ferguson. Difficulties delayed the process and by the time Ferguson was successfully reintubated, she had suffered cardiac asystole resulting in an anoxic brain injury. Ferguson has suffered profound and permanent mental impairment as a result of her injuries.

{¶ 6} Testimony at trial was largely in agreement that Nurse Hilleary had been negligent in failing to timely notify Dr. Milburn of the critical changes in Ferguson's condition. Conflicting expert testimony was heard on the advisability of extubating Ferguson at the time ordered by Dr. Dyer on February 28, 1997, in light of her condition at that time. Doctors Hospital elected to settle during the course of trial the claims of respondeat superior liability against it for Nurse Hilleary's alleged negligence. Trial continued as to the plaintiffs' claims against Dr. Dyer and Victorian Village Internal Medicine, Inc. The trial court refused to allow appellant's request to have the jury instructed on the "loaned servant" doctrine, under which appellant asserted that Dr. Dyer could be held liable for not only his own negligence but that of Nurse Hilleary, despite the fact that she was a Doctors Hospital employee and not employed by Dr. Dyer. The jury then returned a verdict finding that Dr. Dyer had not been personally negligent in his treatment of Ferguson. After the verdict, plaintiffs moved unsuccessfully for a

new trial pursuant to Civ.R. 59(A)(9), claiming errors of law on the part of the trial court.

{¶ 7}  Ferguson individually has timely appealed and brings the following assignments of error:

## ASSIGNMENT OF ERROR NO. 1

{¶ 8}  "The trial court erred to the substantial prejudice of plaintiffs-appellants in failing to instruct the jury as to the loaned servant doctrine[.]"

## ASSIGNMENT OF ERROR NO. 2

{¶ 9}  "The trial court erred to the substantial prejudice of plaintiffs-appellants in allowing the defendants-appellees to have the last word in closing argument[.]"

{¶ 10}  Both of appellant's assignments of error concern the trial court's denial of plaintiffs' motion for a new trial.  Accordingly, we initially note that Civ.R. 59(A)(9) provides that the trial court may grant a new trial based upon "[e]rror of law occurring at the trial and brought to the attention of the trial court."  Unlike most other instances in which a trial court decides the question of whether to grant or deny a motion for a new trial, our review of a motion pursuant to Civ.R. 59(A)(9) is de novo, rather than under an abuse-of-discretion standard:

{¶ 11}  "Where a new trial is granted by a trial court, for reasons which involve no exercise of discretion but only a decision on a question of law, the order granting a new trial may be reversed upon the basis of a showing that the decision was erroneous as a matter of law."  *Rohde v. Farmer* (1970), 23 Ohio St.2d 82, 52 O.O.2d 376, 262 N.E.2d 685, paragraph two of the syllabus.

{¶ 12}  We therefore examine appellant's assignment of error to determine whether the trial court erred as a matter of law in denying the motion for new trial.

{¶ 13}  Appellant's first assignment of error asserts that the trial court erred when it refused to allow appellant's proposed jury instruction on the "loaned-servant" doctrine.  Pursuant to this doctrine, more commonly referred to in other jurisdictions as the "borrowed-servant" doctrine, Dr. Dyer could be found vicariously liable for Nurse Hilleary's negligence, even in the absence of personal negligence on the part of Dr. Dyer in his care provided to Ferguson.

{¶ 14}  The loaned-servant doctrine provides that, when one employer lends his employee to another for a particular employment, the employee, for anything done in that employment, must be dealt with as the employee of the one to whom he has been lent, although he remains the general employee of the

loaning employer. *Halkias v. Wilkoff Co.* (1943), 141 Ohio St. 139, 25 O.O. 257, 47 N.E.2d 199, paragraph four of the syllabus. The doctrine has various applications depending on the posture of the case. It can apply to insulate the general employer from liability for torts committed by the employee while loaned to perform work for another, *Sanders v. Mt. Sinai Hosp.* (1985), 21 Ohio App.3d 249, 21 OBR 292, 487 N.E.2d 588; can be invoked to determine whether a specific statutory or common-law immunity springing either from the nature of the general employer or the borrowing employer may apply to bar recovery by a loaned employee injured in the performance of his work, *Vandriest v. Midlem* (1983), 6 Ohio St.3d 183, 6 OBR 239, 452 N.E.2d 321; may be determinative of workers' compensation issues, *Daniels v. MacGregor Co.* (1965), 2 Ohio St.2d 89, 31 O.O.2d 141, 206 N.E.2d 554; and, last, as in the case before us, may serve to attach vicarious tort liability to an entity other than the general employer of the negligent employee.

■ {¶ 15} In applying the loaned-servant doctrine, Ohio courts have frequently, when attempting to assess whether the borrowing employer should be held liable for the torts of the employee, applied criteria reminiscent of those in independent-contractor cases. In determining whether the borrowed employee has become a loaned servant of a party other than his general employer, the inquiry should focus on the question of control, that is, whether the general employer has retained direction and control over the employee, or whether, with respect to the particular act or acts resulting in tort liability, the control of the employee has passed to the borrowing employer " 'with reference not only to the result reached but to the method of reaching it.' " *Cincinnati Ins. Co. v. Continental Cas. Co.* (Dec. 6, 1995), Hamilton App. No. C–940884, 1995 WL 714262, quoting *Halkias,* supra. This test, often referred to in academic discussion (if not in Ohio cases) as the "spot-control" test, is by no means unanimously adopted, and competing tests have been adopted in various jurisdictions: one such test invokes the "dual-liability" rule, in which both the general and borrowing employer may be found liable, and another relies on the "transfer-of-allegiance" rule, which greatly restricts the loaned-servant doctrine, applying it only in cases where command of the employee has been totally and uncompromisingly surrendered by the general employer, and a new master-servant relation can thus be inferred between the employee and the borrowing employer. See, generally, Hynes, Chaos and the Law of Borrowed Servant: An Argument for Consistency (1994), 14 J.L. & Com. 1.

{¶ 16} Although the rule set forth in *Halkias* is by no means a bright-line test, it does, in nonmedical settings, at least allow the borrowed-servant debate on any particular set of facts to be framed with some degree of consistency. However, in cases of medical negligence, such as the one before us, in which the

plaintiff seeks to impose liability upon a physician for the acts of a hospital employee under the more or less remote supervision of the defendant physician, rules applicable in other employment fields may not be universally helpful. See, generally, Coalter, The Vicarious Liability of a Physician for the Negligence of Other Medical Professionals—North Carolina Charts a Middle Course—the Effect of Harris v. Miller (1995), 17 Campbell L.Rev. 375, 383.

{¶ 17} For reasons that bear reviewing in this decision, the law of loaned servant has assumed special dimensions in the law of medical malpractice and negligence. Impetus for finding physicians liable for the acts or omissions of hospital employees originally arose from the doctrine of charitable immunity, which through the 1940s universally protected hospitals from any form of tort liability towards patients. Braden & Lawrence, Medical Malpractice: Understanding the Evolution—Rebuking the Revolution (1998), 25 N.Ky.L.Rev. 675. Both to assure recovery for patients injured by obvious negligence on the part of hospital employees, and to introduce an incentive to guard against negligence in an environment where hospitals, due to their immunity, had little motivation to do so, courts increasingly relied upon the loaned-servant doctrine to impute liability to physicians for all acts committed under their supervision. In its most developed form, known as the "captain-of-the-ship" doctrine, the scope of exposure for physicians very nearly approached strict liability, at least for torts committed by hospital staff in the direct presence of the physician; most typically in the operating room. Lisk, A Physician's Respondeat Superior Liability for the Negligent Acts of Other Medical Professionals—When the Captain Goes Down Without the Ship (1991), 13 U. Ark. Little Rock L.J. 183. As hospital immunity evolved and eventually disappeared, the necessity for this extreme development of the loaned-servant doctrine disappeared as well, and it has been abandoned in nearly all jurisdictions. Id.; *Harris v. Miller* (1994), 335 N.C. 379, 438 S.E.2d 731; Yungtum, the "Captain of the Ship" Sets Sail in Nebraska: Long v. Hacker (1995), 29 Creighton L.Rev. 379. If we may continue in the vein of the nautical analogies which seem to have been so popular in the above-cited authorities, as the "captain-of-the-ship" doctrine receded in the wake and the ship of tort law steamed majestically forward into the uncharted waters of the modern medical-legal sea, courts have navigated unpredictable courses as they strove to ascertain when a physician should be vicariously liable for the negligence of hospital employees.

{¶ 18} In Ohio, nearly all of the cases examining physician liability have been decided on facts in which the physician was exercising direct, personal, and proximate supervision over the hospital employee whose negligence might be imputed to the physician. The notable exception is the case of *Ray v. Markley* (Dec. 11, 1975), Cuyahoga App. No. 34308, which concluded that a physician

involved in a dispensary operated by a large industrial employer should be found not liable for negligent treatment rendered by a nurse outside his direct control. The court applied an independent-contractor analysis comparable to that set forth in *Halkias,* supra, and found that no employer-employee relationship existed between the doctor and the negligent nurse: "Their relationship is comparable to that found in every hospital where a nurse employed by the hospital is given standing orders by an independent doctor. His jurisdiction over the nurse is limited and certainly does not establish a general master-servant relationship." Id. In the absence of a general master-servant relationship, the court concluded that no loaned-servant relationship could be established either, again finding that a published procedures guide, or standing orders as to a specific patient, would not establish sufficient control on the part of a physician to support vicarious liability for subsequent negligence by a nurse. The court in *Ray* cited *Bernardi v. Community Hosp. Assoc.* (1968), 166 Colo. 280, 443 P.2d 708, in which the Colorado Supreme Court held that written post-operative instructions left by an attending physician would not give rise to vicarious liability for subsequent negligence on the part of a nurse in performing an injection pursuant to those instructions, when the physician was not present and had no opportunity to control the details and manner of administration of the injection by the nurse. The court in *Ray* agreed that such remote supervision or direction did not establish respondeat superior liability.

{¶ 19} In contrast, the bulk of other cases on this issue in Ohio have involved negligence by hospital employees occurring in the setting of the operating room, under the direct supervision of a physician. Most common are those cases involving nurse anesthetists. In *Hanna v. Bel–Park Anesthesia Assoc., Inc.* (Aug. 19, 1980), Mahoning App. No. 79 C.A. 82, the nurse anesthetist during a surgical procedure failed to follow through on the surgeon's request to administer an anti-clotting agent. As a result, the patient died. The court concluded that, despite the nurse anesthetist's presence in the operating room, and the fact that the surgeon had the unquestioned authority to have the nurse anesthetist administer the drug, the nurse was not under such conditions the loaned servant of the surgeon:

{¶ 20} "The critical distinction in this concept of dual agency is who controls the method or manner of doing the work. As is clear from [*Ragone v. Vitali & Beltrami, Jr., Inc.* (1975), 42 Ohio St.2d 161, 71 O.O.2d 164, 327 N.E.2d 645], where the [principal] sought to be charged is merely interested in the end result (that Heparin effects a pharmacological result inside the patient), as opposed to leaving the mechanism to be selected by the agent as to how he or she attains that result, the doctrine of loaned servant does not apply." Id.

{¶ 21} The court also relied on the Restatement Agency, Section 227, for the proposition that other factors to be determined in considering whether a servant has become a loaned servant with respect to certain services are (1) whether the general employer continues to maintain the right to substitute another employee at any time, and (2) the specialized nature of the skills contributed by the employee. Because the anesthesiology group, the general employer in *Hanna*, retained the right to hire, fire, or substitute for the nurse anesthetist, and the nurse was specially qualified for the work which was outside the scope of expertise of the surgeon, these factors should be weighed heavily against a finding that the nurse had become the loaned servant of the surgeon. The court accordingly found no vicarious liability for the surgeon.

{¶ 22} Subsequently, however, the Ohio Supreme Court, on facts similar to those found in *Hanna*, found liability on the part of the surgeon for the negligence of a nurse anesthetist and, in the process, appellant asserts, substantially expanded the test to be used in determining loaned-servant liability on the part of a borrowing employer. In *Baird v. Sickler* (1982), 69 Ohio St.2d 652, 23 O.O.3d 532, 433 N.E.2d 593, the Ohio Supreme Court examined a situation in which a nurse anesthetist, not an employee of the chief surgeon but functioning in conjunction with the surgeon during a surgical procedure, could subject the surgeon to vicarious liability for the nurse's negligence. The court's opinion heavily stresses the fact that the surgeon admitted at trial that he had instructed the nurse as to procedures he wished to follow while intubating the patient prior to surgery, and that he had personally supervised and physically assisted in the intubation procedure that subsequently gave rise to the claim of negligence. While stressing this physical participation and control by the surgeon over the intubation, the court then appeared to drastically expand the scope of potential liability by noting that, "[m]oreover, even if [the surgeon] had failed to exercise control over the intubation, he clearly, as he himself admitted, had the *right* to control it." (Emphasis added.) Id. at 655, 23 O.O.3d 532, 433 N.E.2d 593.

{¶ 23} Appellant in the present case heavily relies on this comment, which on the facts of *Baird* must be taken as dicta, for the proposition that the Ohio Supreme Court has set forth a hard-and-fast rule that for purposes of the loaned-servant doctrine, mere potential or control or right of control is sufficient to establish vicarious liability on the part of the borrowing employer. Appellant asserts that the Supreme Court has thus abandoned entirely the prior test in *Halkias*, supra, which emphasized the distinction between detailed control over the manner of doing the work and a mere interest in the outcome of the work. Applied to loaned-servant liability in the medical context, such a rule would have far-reaching consequences and, moreover, clearly demand a different outcome in the case before us; however, reading the Ohio Supreme Court's opinion in *Baird*

in its entirety and bearing in mind that the facts in that case in no manner required such an expansive interpretation of the rule, we find that the "right-to-control" test remains inapplicable in Ohio. In reaching this conclusion, we note that, in *Baird,* the Supreme Court went on to refer to the "abjectly discredited captain of the ship doctrine," and refused to "[breathe] new life into that now prostrate doctrine. We make no attempt to impose upon an operating physician the duty of overseeing all that occurs in the highly technical milieu in which he works. Instead, we seek only to ensure that where, in the operating room, a surgeon does control or realistically possesses the right to control events and procedures, he does so with a high degree of care." Id. at 655, 23 O.O.3d 532, 433 N.E.2d 593.

{¶ 24} This language clearly demonstrates that the Ohio Supreme Court did not intend for *Baird* to stand for the considerable expansion in vicarious liability of physicians which appellant urges upon us in the present case. Based upon our interpretation of *Baird* and the other Ohio authorities set forth above, we find that the trial court in the case before us did not err in declining to instruct the jury on the doctrine of loaned servant. Under the circumstances of this case, there was insufficient evidence of a master-servant relationship between the hospital employees and Dr. Dyer. As noted by the trial court, while Dr. Dyer gave physician orders regarding the care and treatment of Ferguson with the expectation that these orders would be generally adhered to by the hospital staff in the doctor's absence, Dr. Dyer did not exercise control over the nurses regarding the detail and manner in administration of care pursuant to the orders. Dr. Dyer had no control over nursing staff schedules and assignments, and nursing assignments were carried out pursuant to hospital policies and procedures. As the court found in *Ray,* supra, we find that issuance of standing orders regarding a patient, where the advisability and clinical judgment of such standing orders themselves are not being called into question, is insufficient basis upon which to base liability on the part of a physician pursuant to the loaned-servant doctrine because of subsequent negligence on the part of hospital employees in attending to the patient who is the subject of those orders.

{¶ 25} We therefore find in accordance with the vast majority of jurisdictions that have considered the question, that mere potential or possible control, of itself, is an insufficient basis to find liability pursuant to the loaned-servant doctrine. The fact that Dr. Dyer *could* have appeared at the hospital and exerted at the very least influence if not absolute authority over the nurses in their care of Ferguson was not enough upon which to base a finding of liability. We accordingly find that there was insufficient evidence before the trial court to warrant submitting to the jury as a question of fact the issue of whether Dr. Dyer could be found liable under the loaned-servant doctrine, and the trial court did

not err in refusing to give the requested instruction. Appellant's first assignment of error is accordingly overruled.

{¶ 26} Appellant's second assignment of error asserts that the trial court erred in allowing appellees to present a rebuttal at closing arguments, thus getting the "last word" at trial. R.C. 2315.01(C) and (F) provide, with respect to the order of argument, that the "party who would be defeated if no evidence were offered on either side, first, must produce [his] evidence, and the adverse party must then produce [his] evidence. * * * The parties then may submit or argue the case to the jury. The party required first to produce [his] evidence shall have the opening and closing arguments." In the present case, the trial court concluded that, in rebuttal, appellant had placed the burden upon Dr. Dyer to establish negligence on the part of hospital employees, and that with the burden thus being placed upon Dr. Dyer, he should be permitted a rebuttal on that issue only where he had the burden of proof. The trial court then instructed the jurors that the burden of proof had shifted to Dr. Dyer to prove that the hospital was negligent and that its negligence proximately caused injury to the plaintiff. Dr. Dyer then was indeed permitted the "last word," in the form of a surrebuttal, in which the issue or negligence on the part of the hospital was addressed.

{¶ 27} R.C. 2315.01 specifically provides that the court, "for special reasons," may alter the order of argument otherwise called for under the statute. Under the circumstances, the trial court's decision to allow a surrebuttal on the part of appellee does not constitute an abuse of discretion, and given the restricted scope of the rebuttal, little, if any, prejudice to appellant can be discerned. Appellant's second assignment of error is accordingly overruled.

{¶ 28} In accordance with the foregoing, appellant's first and second assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.

Judgment affirmed.

BOWMAN and BROWN, JJ., concur.