DECISION. *Page 2 
{¶ 1} Plaintiff-appellant Deborah Fisher appeals from the trial court's entries granting summary judgment to defendants-appellees Harry Van Loveren, M.D., Brad Osborne, M.D., Mayfield Neurological Institute, and Good Samaritan Hospital on her medical-negligence claims.
 {¶ 2} On December 18, 1990, Fisher was admitted to Good Samaritan Hospital. On December 20, 1990, she underwent surgery to drain and remove a cystic tumor in her brain. The surgery was performed by Dr. Van Loveren, an employee of the Mayfield Neurological Institute, with the assistance of Brad Mullen, M.D., the chief neurological resident at Good Samaritan Hospital and an employee at the University of Cincinnati. During her post-operative period, Fisher was under the care of Dr. Van Loveren, Dr. Mullen, Dr. Osborne, a first-year resident at Good Samaritan, and the nursing staff at Good Samaritan, when her neurological condition significantly deteriorated. Fisher suffered permanent and serious brain damage.
 {¶ 3} In December 1991, Fisher brought suit against Dr. Van Loveren, Dr. Osborne, Dr. Mullen, Mayfield Neurological Institute, and Good Samaritan Hospital. She alleged that they had failed to properly respond to her deteriorating condition and to render the appropriate standard of needed medical care. Dr. Mullen immediately filed a motion to dismiss on the basis that he was a state employee of the University of Cincinnati. Fisher subsequently dismissed Dr. Mullen from the case and filed suit against the University of Cincinnati in the Court of Claims.
 {¶ 4} In January 1998, the Court of Claims issued a decision holding that Dr. Mullen had acted within the scope of his employment with the University of Cincinnati when he had treated Fisher and that he was entitled to personal immunity *Page 3 
pursuant to R.C. 2743.02(F) and 9.86 for any medical malpractice he had allegedly committed while treating Fisher. In August 1998, the Tenth Appellate District affirmed the judgment of the Court of Claims.[1]
Fisher's suit against the University of Cincinnati is currently pending in the Court of Claims, but it has been stayed pending the outcome of this appeal.
 {¶ 5} In the meantime, Fisher's claims against the other defendants proceeded in the trial court. After lengthy discovery, all the defendants moved for summary judgment. On April 24, 1997, the trial court granted summary judgment to all the defendants except Good Samaritan Hospital. The trial court concluded that Fisher had failed to present any expert testimony that Dr. Van Loveren, Dr. Osborne, or the nursing staff at Good Samaritan Hospital had deviated from the appropriate standards of medical care. The trial court also granted summary judgment to the Mayfield Neurological Institute because the only claim against it had been predicated upon the doctrine of respondeat superior.
 {¶ 6} The trial court, however, found sufficient evidence in the record to create a genuine issue of material fact as to the adequacy of care provided by Dr. Mullen. The trial court further found that Mullen's status as chief neurological resident at Good Samaritan Hospital arguably created an agency relationship with the hospital that was sufficient to overcome summary judgment. Shortly thereafter, Good Samaritan Hospital moved the trial court for reconsideration of its decision, which the trial court denied.
 {¶ 7} In January 2005, Good Samaritan again moved for summary judgment, arguing that it could not be held vicariously liable for the actions of Dr. Mullen because he had been found to be a state employee immune from suit under *Page 4 
R.C. 9.86 at the time of the alleged malpractice. The trial court denied its motion in August 2005 on the basis that there was an "apparent agency" between Dr. Mullen and Good Samaritan Hospital.
 {¶ 8} In August 2006, Good Samaritan again moved for reconsideration of the court's ruling on its motion for summary judgment based upon the Ohio Supreme Court's decision in Comer v. Risko.[2] In March 2007, the trial court granted the motion on the basis that Good Samaritan's potential vicarious liability for Dr. Mullen's alleged malpractice had been extinguished when Dr. Mullen had been granted immunity under R.C. 2743.02(F) and 9.86 and that no liability could, therefore, attach to Good Samaritan under an apparent-agency theory.
 {¶ 9} Fisher now appeals from each of the trial court's entries granting summary judgment to Dr. Van Loveren, Dr. Osborne, Mayfield Neurological Institute, and Good Samaritan Hospital. She raises four assignments of error for our review. Finding none of her assignments to be meritorious, we affirm the judgment of the trial court.
 I. Standard of Review {¶ 10} Summary judgment is appropriate when "(1) no genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party. "[3] We review a trial court's decision to grant a motion for summary judgment de novo.[4] *Page 5 
 I. Dr. Van Loveren and Mayfield Neurological Institute
 {¶ 11} In her first assignment of error, Fisher contends that the trial court erred in granting summary judgment to Dr. Van Loveren and the Mayfield Neurological Institute. Fisher makes three main arguments as to why summary judgment was improvidently granted. First, she argues that the affidavit and deposition testimony of her expert witness, Dr. L. David Rutberg, created a genuine issue of material fact about the care and treatment rendered by Dr. Van Loveren. Next, she contends that there was sufficient evidence to hold Dr. Van Loveren responsible for the actions of Dr. Osborne and Dr. Mullen. Finally, she argues that Dr. Van Loveren could be held liable for the incomplete medical record and the late creation of the operative note for her surgery.
 {¶ 12} During Dr. Rutberg's deposition, his opinions, including those provided in two earlier affidavits, were discussed in detail. Dr. Rutberg was specifically asked about any criticism of Dr. Van Loveren, to which he responded in the negative. Specifically, the following discussions took place:
 {¶ 13} "Q. Doctor, do these appear to be the affidavits you executed?
 {¶ 14} "A. Yes, sir.
 {¶ 15} "Q. Other than what is stated in the affidavits, do you believe that the care provided by Dr. Van Loveren was within accepted medical standards?
 {¶ 16} "A. Yes sir.
 {¶ 17} "Taking a look at the affidavit of September 10, 1996, in paragraph seven or five-* * *
 {¶ 18} "Q. Five.
 {¶ 19} "A. Five. Okay. *Page 6 
 {¶ 20} "Q. You state that, quote, The physicians and nurses responsible for Ms. Fisher on December 24, 1990 failed to render to Ms. Fisher the appropriate standard of care requisite under the circumstances on December 24, 1990. Do you recognize that it is acceptable to have residents respond to problems, and that residents have a duty to report significant findings to the attending physicians?
 {¶ 21} "A. Yes.
 {¶ 22} "Q. Do you agree, without such communication, the attending cannot be expected to be clairvoyant about what might be going on with the patient, and respond to it?
 {¶ 23} "A. Yes.
 {¶ 24} "Do you agree that after Dr. Van Loveren was notified of a problem, he responded promptly?
 {¶ 25} "Yes, he did.
 {¶ 26} * * *
 {¶ 27} "Q. Within the context of your opinions stated in your affidavit as to care rendered by Dr. Van Loveren, what opinion do you have as to — within the context of that affidavit — let me rephrase this. Do you have an opinion whether Dr. Van Loveren's care fell below the accepted standard of care?
 {¶ 28} "A. I don't believe his did, no.
 {¶ 29} "Q. And you have no other opinions as to the standard of care by Dr. Van Loveren outside of what's stated in the affidavits?
 {¶ 30} "A. That's true. That's correct."
 {¶ 31} Thus, Dr. Rutberg testified that his opinions were limited to those set forth in his affidavits, and when asked whether Dr. Van Loveren's care fell below the accepted standards, he testified that it did not. Fisher attempts to cloud the issue *Page 7 
with a CT scan that was conducted on December 24, 1990. But Dr. Rutberg's testimony does not support Fisher's assertions; rather, it affirmatively demonstrates the absence of evidence on this issue. As a result, we find her first argument meritless.
 {¶ 32} Fisher next argues that Dr. Van Loveren could have been held vicariously liable for the acts or omissions of Dr. Osborne and Dr. Mullen on December 24, 1990, because as the attending physician he had the ultimate responsibility for her care. Fisher cites a number of cases to support her argument, but they are all factually distinguishable in that the attending physician in each was made aware of what was going on and did not intervene.[5]
 {¶ 33} Here, the record reveals that Dr. Van Loveren was not made aware of any problems with Fisher until very late in the evening on December 24, 1990, and that after being contacted, he arrived at the hospital within approximately 15 minutes.[6] Fisher's expert, Dr. Rutberg, testified that upon his arrival, Dr. Van Loveren took appropriate measures in treating Fisher. Consequently, Dr. Van Loveren was entitled to summary judgment on this argument as well.
 {¶ 34} Furthermore, to the extent that Fisher claims all the defendants should have remained in this case because there had been deposition references to "team" treatment, Dr. Rutberg's opinions given in his deposition and affidavits do not reflect that he agreed with such an assertion. Dr. Rutberg referred to the conduct and *Page 8 
actions of specific parties and did not render opinions against the "team." Consequently, the trial court did not err in failing to find a genuine issue of material fact as to this issue.
 {¶ 35} Fisher next contends that Dr. Van Loveren was negligent in failing to dictate the operative note. But the record reveals that Dr. Mullen, the resident doctor involved in the surgery, had the responsibility of dictating the operative note. Dr. Van Loveren testified that as soon as he learned that Dr. Mullen had not dictated the operative note, he contacted Dr. Mullen. When Dr. Mullen refused to dictate the operative report, Dr. Van Loveren dictated the note himself.
 {¶ 36} Fisher's expert, Dr. Rutberg, acknowledged that it was acceptable practice to require a resident to prepare the operative note in a teaching hospital and that it was acceptable for a doctor to rely on the resident and the hospital to make sure an operative report was prepared, or for the hospital to notify the doctor if a report was not prepared. Dr. Rutberg further testified that the late preparation of the operative note had no causal relationship to any injury Fisher had suffered on December 24. Thus, based upon testimony from Fisher's own expert, the alleged failure to dictate the operative report was a separate and unrelated event to the malpractice on December 24 that had allegedly resulted in injury to Fisher and could not, therefore, have created an issue of fact related to Dr. Van Loveren.
 {¶ 37} Likewise, Fisher's effort to liken Dr. Van Loveren's alleged failure to timely dictate the operative report to the "alteration" or "destruction" of medical records in Moskovitz v. Mt. Sinai Med.Ctr.[7] is not supported by the evidence of record. InMoskovitz, the discovery process produced documentation and deposition testimony that indicated that the defendant physician in that case, Dr. Figgie, had *Page 9 
"whited-out" incriminating portions of his original office chart, added exculpatory language to his original office chart and then made copies of the "new" chart, and destroyed his original chart to conceal his failure to detect the plaintiff's cancer and to place blame on the plaintiff.[8] Thus, the discovery testimony from the various witnesses and the "new" office chart and other records were facially contradictory.[9]
 {¶ 38} Here, there was no evidence in the discovery testimony or documentation to indicate anything more than a late dictation of the operative note. There was no evidence that the operative report did not accurately reflect the surgery. Moreover, the plaintiff's allegations inMoskovitz were directed to the care and treatment provided during the office visit for which the records were altered. Here, based upon the opinions and testimony of Dr. Rutberg, Fisher's allegations of deviations resulting in injury to her were wholly separate from and not affected by the lapse in preparing an operative note regarding the surgery. Thus, based upon the record and the expert opinion of Dr. Rutberg, there was no issue of fact as to the operative note.
 {¶ 39} Because Fisher failed to present any expert evidence that Dr. Van Loveren had deviated from the standard of care, he was entitled to summary judgment on her claims.[10] Mayfield Neurological Institute was likewise entitled to summary judgment, as Fisher's only claim against it was based upon the doctrine of respondeat superior.[11] As a result, we overrule Fisher's first assignment of error.
 II. Dr. Osborne *Page 10 
 {¶ 40} In her second assignment of error, Fisher argues that the trial court erred in granting summary judgment to Dr. Osborne and his employer, Good Samaritan Hospital.
 {¶ 41} It is undisputed that Dr. Osborne was employed as a first-year resident at Good Samaritan Hospital and was paid a stipend for his work. In his deposition, Dr. Rutberg affirmatively averred that Dr. Osborne had not deviated from any standard of care, as evidenced by the following excerpt from his deposition testimony:
 {¶ 42} "Q. I want to get this very clear sir, as to who you think fell below the standard of care in the management of this patient. Was it Dr. Osborne or was it Dr. Mullen?
 {¶ 43} "A. Primarily Dr. Mullen.
 {¶ 44} "Q. Do you have any criticisms, then of Dr. Osborne that you feel fell below the standard of care?
 {¶ 45} "A. Thinking about it and realizing that he was just a `lowly intern,' no, no. It is Dr. Mullen primarily.
 {¶ 46} "Q. I understand, now, that you do not feel that Dr. Osborne fell below the standard of care, but rather Dr. Mullen fell below the standard of care, is that correct?
 {¶ 47} "A. Yes, sir. * * *"
 {¶ 48} Fisher nonetheless argues that testimony by a Good Samaritan nurse, Kathleen Athanas, that she had to convince Dr. Osborne to call Dr. Mullen on the evening of December 24 created a genuine issue of material fact as to Dr. Osborne's liability. But when Dr. Rutberg was asked about the nurse's testimony in his deposition, he stated as follows: *Page 11 
 {¶ 49} "A. Well I understand that Dr. Osborne had to be convinced to call the attending, if I understand correctly, by the nurse, and apparently he wasn't going to call the attending. This is what I am led to believe. I don't have that in the chart here. If this is the case, then he didn't recognize the dire circumstances.
 {¶ 50} "Q. Are you guessing sir?
 {¶ 51} "A. Yes, I am guessing. It is hearsay. That is why I stand by what I said before.
 {¶ 52} "Q. Based on what you have in the records sir, aside from your guessing which we don't want you to do, based on what's in the records, do you believe that Dr. Osborne deviated from the standard of care?
 {¶ 53} "A. No, I don't. I am troubled by this, but I don't."
 {¶ 54} Thus, contrary to Fisher's assertions, her own expert testified that he had found no breach in the standard of care by Dr. Osborne. Fisher, furthermore, could not have utilized the deposition testimony of Nurse Athanas to establish any deviation from the standard of care by Dr. Osborne.[12] Because the expert testimony presented by Fisher failed to create a triable issue of fact as to whether Dr. Osborne had deviated from the appropriate standard of medical care, the trial court correctly granted summary judgment on Fisher's claim against Dr. Osborne and his employer, Good Samaritan Hospital. We, therefore, overrule her second assignment of error.
III. Good Samaritan Hospital
 {¶ 55} In her third assignment of error, Fisher argues that the trial court erred in granting summary judgment to Good Samaritan Hospital on the basis of the Ohio Supreme Court's decision in Comer v.Risko.[13] In her fourth assignment of *Page 12 
error, she argues that the trial court's entry of summary judgment for Good Samaritan Hospital violated her constitutional right to a jury trial. Because these assignments of error are interrelated, we address them together.
 {¶ 56} In Comer v. Risko, a plaintiff sued a hospital, claiming that two physicians, who it alleged were its agents, had committed malpractice.[14] The plaintiff, however, did not sue the two physicians who had allegedly committed the malpractice. She only sued the hospital.[15] After the statute of limitations on the plaintiff's unasserted malpractice claims had expired, the trial court granted the hospital's motion for summary judgment.[16] The Ohio Supreme Court held that the plaintiff's claim against a hospital for the negligence of an independent-contractor physician was a derivative claim of vicarious liability and that, under established principles of Ohio law, the claim against the hospital for secondary liability necessarily failed if the statute of limitations had expired on the claim against the physician who was allegedly primarily negligent.[17]
 {¶ 57} In granting Good Samaritan's motion for summary judgment, the trial court in this case found that if any agency relationship had existed between Dr. Mullen and Good Samaritan Hospital, it was the "fictional" relationship of agency by estoppel. Based on our review of the record, we agree with the trial court's determination. At the time of the alleged negligence, the University of Cincinnati maintained the only neurosurgical program in the area. Attending physicians from University Hospital supervised University of Cincinnati neurosurgical residents who rotated through Good Samaritan Hospital. Good Samaritan Hospital contracted *Page 13 
with the University of Cincinnati to provide neurological services at Good Samaritan Hospital when Fisher was a patient.
 {¶ 58} The Court of Claims held, and the Tenth Appellate District affirmed its determination, that Dr. Mullen was not an employee of Good Samaritan Hospital at the time of the alleged negligence. Rather, he was a University of Cincinnati employee. The University of Cincinnati, furthermore, was an independent contractor of Good Samaritan Hospital with respect to providing neurological services.
 {¶ 59} Fisher now argues that Comer does not apply because Dr. Mullen was an actual agent of Good Samaritan. But the evidence in the record does not support Fisher's argument. Fisher, herself, maintained throughout the litigation that Dr. Mullen was an "apparent" agent of Good Samaritan. In an affidavit attached to her memorandum opposing summary judgment, Fisher parroted the necessary language for an agency-by-estoppel claim, stating that "at no time did Dr. Mullen or anyone on behalf of Good Samaritan Hospital inform me that Dr. Mullen was not an employee or agent of Good Samaritan Hospital. * * * I believed Dr. Mullen was employed by Good Samaritan Hospital since that is where I had contact with him." Consequently, we cannot conclude that the trial court erred in granting summary judgment to Good Samaritan Hospital on the basis of the Comer decision. We, therefore, overrule Fisher's third assignment of error.
 {¶ 60} Finally, Fisher argues that the trial court's entry of summary judgment for Good Samaritan Hospital violated her constitutional right to a jury trial based upon this court's decision in Vanderpool v.University Hospital.[18] She argues that, in Vanderpool, this court held that a private hospital may be vicariously liable, under respondeat superior, for the acts of its agents, even if the agents are immune from *Page 14 
personal liability pursuant to a statute. Consequently, she asserts that she could have maintained her claim against Good Samaritan even though Dr. Mullen had been found to be personally immune from suit. We disagree.
 {¶ 61} Vanderpool did not provide Fisher with a right of recovery against Good Samaritan Hospital for two reasons. First,Vanderpool was decided before the Ohio Supreme Court's decision inComer. Second, it is factually distinguishable. Central to our holding in Vanderpool was the fact that the plaintiff in that case had sought out the clinic of a private hospital for treatment, and had looked to the clinic, rather than any specific doctor, for her care. Here, Fisher had been treating with Dr. Van Loveren and had gone to Good Samaritan based upon her relationship with him. Thus, Fisher's claims against Good Samaritan Hospital were more analogous to the claims in Comer. Because Fisher's claims against Good Samaritan Hospital were not viable underComer and were factually distinguishable from the claims inVanderpool, she had no right to any trial against Good Samaritan Hospital, let alone a jury trial. As a result, we overrule her fourth assignment of error and affirm the judgment of the trial court.
Judgment affirmed.
DINKELACKER and WINKLER, JJ., concur.
RALPH WINKLER, retired, from the First Appellate District, sitting by assignment.
[1] Fisher v. University of Cincinnati Med. Ctr. (Aug. 25, 1998), 10th Dist. No. 98AP-142.
[2] 106 Ohio St.3d 185, 2005-Ohio-4559, 833 N.E.2d 712.
[3] Temple v. Wean United, Inc. (1977), 50 Ohio St.2d 317, 327,364 N.E.2d 267.
[4] Koos v. Central Ohio Cellular, Inc. (1994), 94 Ohio App.3d 579,641 N.E.2d 265.
[5] See Baird v. Sickler (1982), 69 Ohio St.2d 652, 433 N.E.2d 593
(where the supreme court held that surgeon could be subjected to vicarious liability for a nurse anesthetist where the surgeon testified not only that he instructed and watched the intubation of the patient, but also that he had "the right and duty to halt the procedure" if he thought something was being done improperly; but the court expressly refused to breathe new life into the "captain of the ship" doctrine).
[6] See Ferguson v. Dyer, 149 Ohio App.3d 380, 385-386,2002-Ohio-1442, 777 N.E.2d 850 (noting that "in Ohio, nearly all the cases examining physician liability [in this context] have been decided on facts in which the physician was exercising direct, personal, and proximate supervision over the hospital employee whose negligence might be imputed to the physician").
[7] 69 Ohio St.3d 638, 1994-Ohio-324, 635 N.E.2d 331.
[8] Id. at 639-649.
[9] Id.
[10] Bruni v. Tatsumi (1976), 46 Ohio St.2d 127, 131,346 N.E.2d 673.
[11] Wells v. Spirit Fabricating Ltd. (1996), 113 Ohio App.3d 282,294, 680 N.E.2d 1046.
[12] See Morris v. Children's Hosp. Med. Ctr. (1991),73 Ohio App.3d 437, 444, 597 N.E.2d 1110; Daly v. Hess, 2nd Dist. No. 22048,2008-Ohio-2884, ¶ 21.
[13] 106 Ohio St.3d 185, 2005-Ohio-4559, 833 N.E.2d 712.
[14] 106 Ohio St.3d 185, 2005-Ohio-4559, 833 N.E.2d 712.
[15] Id. at ¶ 9.
[16] Id. at ¶ 5.
[17] 106 Ohio St.3d 185, 2005-Ohio-4559, 833 N.E.2d 712, at paragraphs one and two of the syllabus.
[18] 1st Dist. No. C-020020, 2002-Ohio-5092. *Page 1