[Cite as *Queener v. DiCicco*, 2013-Ohio-2934.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

ALEXANDER QUEENER, et al.           :

     Plaintiff-Appellant           :           C.A. CASE NO.    25348

v.                                  :           T.C. NO.    09CV9915

JOSEPH DICICCO, D.O., et al.        :           (Civil appeal from
                                                Common Pleas Court)

     Defendants-Appellees          :

                                    :

. . . . . . . . . .

## O P I N I O N

Rendered on the ____3rd____ day of _____July_____, 2013.

. . . . . . . . . .

MICHAEL L. GAY, Atty. Reg. No. 0024579, 537 East Pete Rose Way, Suite 400, Cincinnati, Ohio 45202
     Attorney for Plaintiff-Appellant

PATRICK K. ADKINSON, Atty. Reg. No. 0016980, 4244 Indian Ripple Rd., Suite 150, Dayton, Ohio 45440
     Attorney for Defendants-Appellees

. . . . . . . . . .

DONOVAN, J.

     **{¶ 1}**   Alexander Queener appeals from a judgment of the Montgomery

County Court of Common Pleas, which directed a verdict in favor of Dr. Joseph DiCicco and Orthopedic Associates of Southwestern Ohio, Inc., on Queener's claim for negligence. For the following reasons, the judgment of the trial court will be affirmed.

{¶ 2}    In 2006, Queener developed a benign tumor in his right lower leg, which caused the two bones of the lower leg to become attached.  The tumor was surgically removed by a doctor in Cincinnati.  In 2008, Queener suffered a recurrence of this condition, and he sought treatment from the doctors at Orthopedic Associates, namely Drs. Brian Ceccarelli and DiCicco.  On June 11, 2008, Dr. DiCicco removed the new tumor.

{¶ 3}    In the early morning hours of Sunday, June 15, while Queener was recuperating at his mother's home, he fell onto a coffee table, injuring his surgically-repaired leg.[1]    He failed to seek medical attention.  Later in the day, the pain in Queener's leg increased significantly.  After consulting with Dr. Ceccarelli, who was on call for Orthopedic Associates, Queener went to Miami Valley Hospital,[2] where he was diagnosed as having a blood clot in his right leg.  He was then transferred to Grandview Hospital, where he was admitted for observation.

{¶ 4}    In June of 2008, Dr. Micah Hobbs was a third-year resident at Grandview Hospital and was working a three-month rotation with the doctors of Orthopedic Associates.  Dr. Hobbs, along with other doctors from Orthopedic Associates and doctors in other

---

[1]Queener recounted the manner of the injury to his mother at the time, but in his later testimony he stated that he had no recollection of how the injury occurred.

[2]The doctors of Orthopedic Associates have privileges at Grandview Hospital but, recognizing that Grandview did not have the types of doctors on call on the weekends that might be necessary to evaluate Queener's injury, he was initially instructed to go to Miami Valley Hospital.

specialties, including vascular specialists, monitored Queener's condition during his stay at Grandview. It is undisputed that Dr. Hobbs was employed by Grandview Hospital. Drs. DiCicco and Ceccarelli had privileges at Grandview Hospital, but no evidence was adduced that they were employed by the hospital.

{¶ 5} At the time of his admission, Queener's "differential diagnosis" (meaning a range of possible or suspected causes of the condition that was being evaluated) included a condition know as "compartmental syndrome." Thus, the doctors who were treating him were watching for signs of this condition. According to several witnesses who testified at trial, the lower leg includes four "compartments" defined by strong connective tissue. The connective tissue cannot readily expand, so if pressure increases in any of the compartments due to bleeding or swelling, the resulting build-up of pressure can cause severe tissue damage; normal blood flow and tissue function are impaired by the pressure. Typical symptoms of compartmental syndrome include firmness of the tissue and significant pain. The development of compartmental syndrome requires treatment within several hours, because of the swiftness with which tissues can be irreparably damaged.

{¶ 6} After his transfer to Grandview, an ultrasound examination showed that no blood clot was present in Queener's right leg, but a hematoma (a collection of blood under the skin) was present. On Monday, June 16, Dr. Ceccarelli examined Queener at 1:00 p.m. and saw no indications of compartmental syndrome. Normally, another doctor from the practice would have checked on Queener during rounds on Tuesday, but the record did not contain any notes reflecting such a visit. Dr. Hobbs examined Queener on Monday and again on Tuesday morning; like Dr. Ceccarelli, he saw no signs of compartmental syndrome,

noting that the tissue of the leg was "soft" and "compressible." Queener was experiencing some leg pain, but not to a degree that concerned Dr. Hobbs; it was not "out of proportion." Queener had no pain with passive movement of his toes. Dr. Hobbs reported his findings to Dr.DiCicco.

{¶ 7} On Tuesday, Dr. Hobbs began to consider putting Queener on Dr. DiCicco's surgical schedule for removal of the hematoma, and, on Tuesday night, Dr. Hobbs put Queener on Dr. DiCicco's surgical schedule for Wednesday. When Dr. Hobbs examined Queener on Wednesday morning, Dr. Hobbs noted that the tissue of Queener's lower right leg was firm, but he did not consider this change to be significant. He testified that "agonizing pain" generally accompanies compartmental syndrome, and Queener was not in significant pain Wednesday morning (or at any other time during the week) and was able to move around in his bed. Queener was taking pain medication during this time.

{¶ 8} When Dr. DiCicco performed surgery on Queener Wednesday afternoon, June 17, he (Dr. DiCicco) discovered a significant amount of dead tissue in Queener's lower leg. Dr. DiCicco testified that the tissue looked like it had been dead for several days. Drs. DiCicco and Hobbs believed that Queener had suffered compartmental syndrome prior to his admission to Grandview Hospital, which had subsided by the time they first examined him. The damage to and subsequent removal of tissue from Queener's leg left him with a limp and other physical limitations.

{¶ 9} In December 2009, Queener filed a complaint against DiCicco and Orthopedic Associates (hereinafter, "Dr. DiCicco") for negligence in failing to diagnose and

properly treat his condition.[3] Dr. DiCicco maintained that Dr. Hobbs had not been negligent and that, even if Dr. Hobbs had been negligent, he (Dr. DiCicco) was not liable for the negligence. The case went to trial in July and August 2012. After the jury was seated, but before testimony began, Dr. DiCicco moved for a directed verdict on two bases: 1) there was no evidence that Dr. DiCicco had deviated from the standard of care, and Dr. DiCicco was not vicariously liable for an error, if any, made by the hospital's resident, Dr. Hobbs, and 2) due to the statute of limitations, Queener could no longer pursue a claim against Dr. Hobbs and, if the statute of limitations prevents an action against the "agent," it also precludes an action against the "principal."

{¶ 10} The court initially declined to rule on Dr. DiCicco's motion for directed verdict, but, after hearing the testimony of Queener's witnesses, the court granted the motion. The court found "no evidence that Dr. DiCicco exercised control over how Dr. Hobbs examined, monitored, or tested Mr. Queener concerning compartment syndrome or any other condition. * * * [T]here is simply insufficient evidence that Grandview Hospital passed control of Dr. Hobbs's conduct to Dr. DiCicco so that Dr. Hobbs became Dr. DiCicco's loaned servant. Therefore, Dr. DiCicco cannot be vicariously liable for Dr. Hobbs's negligence."

{¶ 11} On appeal, Queener contends that the trial court erred in granting a directed verdict and in concluding that Dr. DiCicco was not responsible for Dr. Hobbs's negligence.

{¶ 12} In considering a motion for a directed verdict, a court must construe the evidence most strongly in favor of the party against whom the motion is directed, and the

---

[3] Queener did not file a claim against Dr. DiCicco for negligent supervision of Dr. Hobbs.

motion must be overruled unless reasonable minds could reach no other conclusion but that, under the applicable law, the movant is entitled to judgment in his favor. Civ.R. 50; *Texler v. D.O. Summers Cleaners & Shirt Laundry Co.*, 81 Ohio St.3d 677, 679, 1998-Ohio-602, 693 N.E.2d 271; *Butler v. Stevens*, 2d Dist. Montgomery No. 22822, 2009-Ohio-2775, ¶ 25. A trial court's decision on a motion for directed verdict presents a question of law, which an appellate court reviews de novo. *Strategy Group for Media, Inc. v. Lowden,* 5th Dist. Delaware No. 12 CAE 03 16, 2013-Ohio-1330, ¶ 43, citing *Groob v. Keybank*, 108 Ohio St.3d 348, 2006-Ohio-1189, 843 N.E.2d 1170, ¶ 14. A directed verdict is appropriate where a plaintiff fails to present evidence from which reasonable minds could find in the plaintiff's favor. *Id.*

**{¶ 13}** In reaching its decision that Dr. DiCicco could not be held vicariously liable, the trial court relied on *Baird v. Sickler*, 69 Ohio St.2d 652, 433 N.E.2d 593 (1982) and *Ferguson v. Dyer*, 149 Ohio App.3d 380, 2002-Ohio-1442, 777 N.E.2d 850 (10th Dist.).

**{¶ 14}** *Baird* involved surgery on a woman who, due to her physical condition, including osteoarthritis of her spine, presented a difficult intubation for anesthetics. A nurse-anesthetist, who was not an employee of the surgeon, performed the intubation under specific instruction from, and with the assistance of, the surgeon, who recognized the difficulties posed by the intubation of this particular patient. The Ohio Supreme Court held that a directed verdict for the surgeon had been improper and that the surgeon might have been liable under a theory of respondeat superior, because he controlled and participated in the administration of the anesthetic. The court also allowed for the possibility that the

surgeon could have been held liable even if he had failed to exercise actual control over the intubation, because, under the facts presented in that case, the surgeon clearly "had the right to control it." *Id.* at 654. The Supreme Court expressly declined, however, to "breath[e] new life" into the "abjectly discredited 'captain of the ship doctrine' which held a chief surgeon responsible for all that transpires in the operating room." *Id.* at 655.

{¶ 15} Although the trial court discussed the Supreme Court's holding in *Baird*, it was cognizant that the holding, and particularly the sweeping language about a doctor's potential liability based on an unexercised "right to control" a hospital employee, has been viewed with caution by other courts. In fact, at least one court has declined to apply the court's statement about liability based on the surgeon's "right to control," viewing it as dicta. *Ferguson* at ¶ 23. *Ferguson* rejected an appellant's argument that the Supreme Court "set forth a hard-and-fast rule that for purposes of the loaned-servant doctrine, mere potential [to] control or right of control is sufficient to establish vicarious liability on the part of the borrowing employer." *Id.*

{¶ 16} In *Ferguson*, a doctor gave orders regarding the care and treatment of the patient with the expectation that these orders would be generally adhered to by the hospital staff in the doctor's absence; it was undisputed that a nurse negligently failed to notify the doctor or the resident on duty of critical changes in the patient's condition. The appellate court found that, where the advisability and clinical judgment of the doctor's standing orders themselves were not called into question, there was an "insufficient basis upon which to base liability on the part of a physician pursuant to the loaned-servant doctrine because of subsequent negligence on the part of hospital employees in attending to the patient who is

the subject of those orders."  *Id*. at ¶ 24.

{¶ 17}  *Ferguson* further reasoned:

{¶ 18}  "[R]eading the Ohio Supreme Court's opinion in *Baird* in its entirety and bearing in mind that the facts in that case in no manner required such an expansive interpretation of the rule, we find that the 'right-to-control' test remains inapplicable in Ohio.  In reaching this conclusion, we note that, in *Baird*, the Supreme Court referred to the 'abjectly discredited captain of the ship doctrine,' and refused to '[breathe] new life into that now prostrate doctrine. We make no attempt to impose upon an operating physician the duty of overseeing all that occurs in the highly technical milieu in which he works. Instead, we seek only to ensure that where, in the operating room, a surgeon does control or realistically possesses the right to control events and procedures, he does so with a high degree of care.'"  *Id*. at ¶ 23, citing *Baird* at 655.

{¶ 19}  In sum, *Ferguson* held that the mere potential or possible control by a doctor of a hospital employee is an insufficient basis to find liability on the part of a doctor pursuant to the loaned-servant doctrine, and that the fact that a doctor *could have* exerted influence or control over hospital employees in their care of a patient was not enough upon which to base a finding of liability.  *Id*. at ¶ 25.

{¶ 20}  The trial court adopted the reasoning in *Ferguson*, and its narrow interpretation of *Baird*, in granting a directed verdict in favor of Dr. DiCicco.  Queener presented no evidence that Dr. DiCicco had employed Dr. Hobbs or that he had directly supervised or controlled Dr. Hobbs in his care of Queener.  At most, the evidence established that, after examining Dr. DiCicco's patients, Dr. Hobbs regularly reported his

findings to Dr. DiCicco, and, in consultation with Dr. DiCicco, Dr. Hobbs placed patients on Dr. DiCicco's surgical schedule. There is nothing in the record to suggest that Dr. DiCicco was involved in Dr. Hobbs's care of Queener at the hospital to the degree that was present in *Baird*, where the surgeon, during a surgical procedure, specifically advised and assisted a nurse-anaesthetist on the manner of intubating a patient, which intubation led to the patient's paralysis. Applying the standard set forth in *Ferguson*, the trial court concluded:

> An attending physician is not expected to be, nor can he be, at the hospital all day every day. Based upon that, the evaluation and care and testing and monitoring of a patient is generally left to employees of the hospital, be they nurses, residents, interns, fellows, whatever the case may be.

> And in this case, during the time period involved, again, from 5:30 a.m. on Tuesday until 5:30 a.m. on Wednesday, it was the duty of the hospital employees to do the testing generally and the testing specifically for the compartment syndrome.

> Dr. DiCicco was not involved in that and, realistically, under the situation presented when a patient's in the hospital, unless the doctor is specifically directing how certain things are to be done, he cannot be held responsible for a failure by a hospital employee, in this case, Dr. Hobbs, the resident, assuming there is such a failure.

{¶ 21} Based on the evidence presented in this case, the trial court properly concluded that a directed verdict in favor of Dr. DiCicco was appropriate. Reasonable minds could not have concluded that Dr. DiCicco employed Dr. Hobbs or controlled Dr.

Hobbs's care of Queener to such an extent that he could be held liable for Dr. Hobbs's alleged negligence.[4]

{¶ 22} Queener also relies on *Lownsbury v. VanBuren*, 94 Ohio St.3d 231, 2002-Ohio-646, 762 N.E.2d 354, for the proposition that an attending physician "who contracts to provide resident supervision at a teaching hospital" is liable to the patients treated by the residents, although no direct doctor-patient relationship may exist between the attending physician and the patient. However, the supreme court's decision in that case relied heavily on the hospital's contract with the supervising or attending physician, the duties the attending had undertaken pursuant to that contract, and the lack of a "traditional" or direct doctor-patient relationship between the attending physician and the patient in that case.

{¶ 23} Of course, the existence of the doctor-patient relationship is not in dispute in Queener's case, as Dr. DiCicco had operated on Queener prior to his admission to the hospital. *Lownsbury* and several of the cases upon which it relies involved attending physicians who assumed a "duty of supervisory care" through "contractual and employment arrangements with the hospital." In Queener's case, no evidence was presented regarding the nature of DiCicco's relationship with Grandview Hospital. In other words, it is unclear whether he contracted with the hospital to supervise its residents or whether Dr. Hobbs's "rotation" with Drs. DiCicco and Ceccarelli arose out of another type of arrangement. As *Lownsbury* itself observes: "the mere existence of an agreement [delegating the responsibility of supervision] does not * * * end the inquiry of determining who has

---

[4] We express no opinion as to whether Dr. Hobbs was, in fact, negligent.

responsibility for supervision. As with the delegation of all duties, the terms of the agreement between the delegator and the delegatee control. The delegatee will be charged only with the duties that he has voluntarily assumed." *Id.*, citing *Mozingo v. Pitt Cty. Mem. Hosp., Inc.*, 331 N.C. 182, 415 S.E.2d 341 (1992). It is undisputed that Dr. Hobbs consulted with Dr. DiCicco regularly about the care of his patients, but because Queener's evidence did not address whether, or to what extent, Dr. DiCicco assumed a duty to supervise Dr. Hobbs, *Lownsbury* is not instructive.

{¶ 24} The assignment of error is overruled.

{¶ 25} The judgment of the trial court will be affirmed.

. . . . . . . . . .

HALL, J., concurs.

FROELICH, J., dissenting:

{¶ 26} In my view, there is a factual question whether Dr. Hobbs was under the control and direction of Dr. DiCicco when, during a rotation with Orthopedic Associates, Dr. DiCicco entrusted him with the care of Queener, a hospitalized patient of the practice. If this were a jury verdict, I would affirm; however, because I conclude that reasonable minds could disagree on this point, I would hold that the trial court's directed verdict for DiCicco was improper.

{¶ 27} The trial court found that there was "not a sufficient basis to give the loaned servant [jury] instruction," Ohio Jury Instruction 417.09, regarding Dr. Hobbs's acts because there was "no evidence that Dr. DiCicco exercised control over how Dr. Hobbs examined, monitored, or tested Mr. Queener concerning compartment syndrome or any

other condition." The court recognized that Dr. DiCicco "was interested in the outcome" and wanted Queener "to be properly monitored," but concluded that Dr. DiCicco "had absolutely no control" because he had not been at the hospital during the relevant periods. The court stated: "[T]here is simply insufficient evidence that Grandview Hospital passed control of Dr. Hobbs's conduct to Dr. DiCicco so that Dr. Hobbs became Dr. DiCicco's loaned servant. Therefore, Dr. DiCicco cannot be vicariously liable for Dr. Hobbs's negligence."

{¶ 28} Queener's mother, a nurse, respected Dr. DiCicco's practice. Queener had specifically sought out Drs. Ceccarelli and DiCicco to care for him, and Dr. DiCicco had operated on Queener only a few days before Queener developed compartment syndrome. Queener was transferred from Miami Valley Hospital to Grandview Hospital for the sole reason that Drs. DiCicco and Ceccarelli practiced there. During the time that Queener was at Grandview, Dr. Hobbs, a resident at Grandview, regularly consulted with Drs. DiCicco and Ceccarelli about Queener's condition, reporting his observations and conclusions. It appears from the record that, during his time at Grandview Hospital, no one examined Queener between Tuesday morning and Wednesday morning, although the testimony by several doctors at trial established that compartment syndrome could occur and cause significant damage within just a few hours. According to Dr. DiCicco's testimony, if Dr. Hobbs thought "something was awry" with one of his (Dr. DiCicco's) patients, he (Dr. Hobbs) would contact Dr. DiCicco.

{¶ 29} According to an expert who testified, Dr. Hobbs was "an extender of the attending physician who is ultimately and completely responsible for the patient." Dr.

Hobbs consulted with Dr. DiCicco about his (Dr. Hobbs's) opinion that Queener should be put on Dr. DiCicco's surgical schedule for Wednesday, June 19 (and obtained Dr. DiCicco's permission to make such an addition to the schedule).

{¶ 30} I do not disagree with the trial court's observation, based on *Ferguson*, that an attending physician "is not expected to be, nor can he be, at the hospital all day every day." Dr. DiCicco argues that Queener is trying to revive the "prostrate doctrine known as 'captain of the ship.'" However, an attending physician can exert control and direction over a resident without being physically present, by giving instructions, approving or disapproving tests, overseeing the frequency and manner in which a patient is monitored, and authorizing specific care.

{¶ 31} "Similes sometimes help explain a factual situation, but in legal writing, phrases have a way of being canonized and of growing until they can stand and walk independently of the usual general rules * * *. 'A phrase begins life as a literary expression; its felicity leads to its lazy repetition; and repetition soon establishes it as a legal formula, undiscriminatingly used to express different and sometimes contradictory ideas.'" Yungtum, *The Captain of the Ship Sets Sail in Nebraska*, 29 Creighton L.Rev. 379 (1995), citing, *Tiller v. Atlantic Coast Line RR Co.*, 318 U.S. 54, 68, 63 S.Ct. 444, 87 L.Ed. 610 (1943) (Frankfurter, J.).

{¶ 32} Thus it is with the use of the phrase "captain of the ship" in malpractice cases, which apparently originated in the Pennsylvania Supreme Court. *McConnell v. Williams*, 361 Pa. 355, 65 A.2d 243 (1949) dealt with a surgeon's selection of an "interne" to assist him and care for a newborn in the operating room of a charitable hospital. The

court referenced "the personal liability of the captain of a vessel for negligent acts of the subordinate officers and crew, whether or not appointed or employed by him." *Id.* at 362, fn.1. Queener's brief does not mention the captain of the ship doctrine, I do not infer it from his arguments, and the Ohio Supreme Court has expressly rejected the doctrine. *See Baird*, 69 Ohio St.2d 652, 655, 433 N.E.2d 593.

{¶ 33} Each party to this appeal presents a parade of horribles. Dr. DiCicco argues that if patients' doctors are sometimes responsible for the negligence of hospital residents, then patients' doctors will never use residents to care for their hospitalized patients and the treatment of patients at hospitals will suffer dramatically. Queener suggests that if patients' doctors are never held responsible, patients' care and treatment will be routinely handled by residents without appropriate direction and control. Resolution of the specific case before us does not require the use of hoary phrases and will not result in the health-care meltdown envisioned by either party.

{¶ 34} I do not suggest that attending physicians are responsible for every action undertaken by a resident. This is a fact-sensitive determination that must be made on a case-by-case basis. In this case, the issue of control and direction was not sufficiently clear to warrant a directed verdict for Dr. DiCicco. Regardless of how the jury would have resolved the factual question, the court erred in removing that choice from it.

{¶ 35} I would reverse the judgment of the trial court and remand for further proceedings. At that time, the trial court could address, among other matters, Dr. DiCicco's alternate argument in favor of a directed verdict, namely that the expiration of the statute of limitations for a claim against Dr. Hobbs precluded a claim against Dr. DiCicco.

. . . . . . . . .

Copies mailed to:

Michael L. Gay
Patrick K. Adkinson
Hon. Michael L. Tucker