[Cite as *Fisher v. Univ. of Cincinnati Med. Ctr.*, 2015-Ohio-3592.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Deborah L. Fisher, | : | |
| Plaintiff-Appellant, | : | |
| | | No. 14AP-188 |
| v. | : | (Ct. of Cl. No. 2003-07235) |
| University of Cincinnati Medical Center, | : | (REGULAR CALENDAR) |
| Defendant-Appellee. | : | |

**P L U R A L I T Y   D E C I S I O N**

Rendered on September 3, 2015

*John H. Metz*, for appellant.

*Michael DeWine*, Attorney General, and *Brian M. Kneafsey, Jr.,* for appellee.

APPEAL from the Court of Claims of Ohio

BRUNNER, J., authoring lead opinion.

{¶ 1}  In this appeal, plaintiff-appellant, Deborah L. Fisher, disputes the adequacy of damages awarded by the Court of Claims of Ohio in her medical malpractice action against defendant-appellee, University of Cincinnati Medical Center.  For the following reasons, through plurality decision, we affirm in part, reverse in part, and remand for further proceedings on economic damages only.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

{¶ 2}  On December 20, 1990, appellant had tumor resection surgery to remove a craniopharyngioma (benign cystic brain tumor).  Dr. Harry Van Loveren performed the surgery with assistance from chief neurology resident Dr. Bradley Mullen.  The record does not reflect that anything unusual happened in surgery, but afterward, while still

hospitalized, appellant's condition deteriorated and she experienced permanent neurological damage.

{¶ 3} Appellant brought an action in the Hamilton County Court of Common Pleas against Dr. Van Loveren, Dr. Mullen and others, alleging that they had failed to render the appropriate standard of medical care in performing her surgery. After Dr. Mullen moved to dismiss on the ground that he was a state employee, appellant voluntarily dismissed him from the action and filed suit against the University of Cincinnati in the Court of Claims. The Court of Claims decided that Dr. Mullen had acted within the scope of his employment with the university during his treatment of appellant and that he was entitled to personal immunity pursuant to R.C. 2743.02(F) and 9.86. We affirmed. *Fisher v. Univ. of Cincinnati Med. Ctr.*, 10th Dist. No. 98AP-142 (Aug. 25, 1998). In Hamilton County, the court of common pleas granted summary judgment for the remaining defendants, and the First District Court of Appeals affirmed. *Fisher v. Van Loveren*, 1st Dist. No. C-070228, 2008-Ohio-4115.

{¶ 4} Appellant voluntarily dismissed her action in the Court of Claims and refiled it in 2003. The Court of Claims bifurcated the issues of liability and damages for trial. A magistrate presided over the liability trial and decided that Dr. Mullen had breached the standard of care recognized by the medical community when, after receiving a report about appellant's condition while she was still hospitalized on December 24, 1990, he failed to return to the hospital to evaluate her or inform Dr. Van Loveren of her continued deterioration. The magistrate found that the unreasonable delay in treatment to relieve intracranial pressure proximately caused appellant's permanent neurological damage. The magistrate recommended judgment in favor of appellant on her medical malpractice claim and dismissal of her claim for punitive damages. Over appellee's timely objections, the Court of Claims adopted the magistrate's decision.

{¶ 5} At the ensuing damages trial, witnesses on appellant's behalf testified that, before the tumor resection surgery she was a physically fit, sharp, creative, disciplined and professional woman. Her sisters, Gloria Wirthwine and Elaine Williams, explained that she since has suffered from memory problems and cannot perform tasks that require multiple steps. Appellant cannot organize her medications and has limited ability to prepare her own meals. She has set several pots on fire. She is depressed, overweight, and walks with a cane. Appellant has fallen and had difficulty getting back up without

assistance.  She cannot handle her finances.  She exhibits irrational behavior and can be angry, uncooperative, and physically violent.  Appellant has lived alone in an apartment in the past decade, but she relies on daily assistance from her sisters.

{¶ 6}  According to her expert neurologist, Dr. Randall Benson, the increased intracranial pressure caused permanent diffuse brain injury and numerous neurological deficits, including impaired problem-solving, socialization, higher language and memory skills.  She has difficulty staying on task, filtering information and making decisions.

{¶ 7}  Dr. Jay Barrash, a board certified neurosurgeon, testified that appellant had a stroke or infarct in the area of the tumor.  In his opinion, the stroke caused weakness on the left side of appellant's body but was not the cause of her cognitive impairments.  He attributed appellant's diffuse brain damage and cognitive deficits to the increased intracranial pressure.  He further opined that appellant lacked insight, judgment, and the ability to follow commands and work.

{¶ 8}  Dr. Bradley Sewick, a clinical neuropsychologist, performed a battery of tests and determined that appellant had a diffuse pattern of brain damage after the resection surgery, resulting in mental deficits including memory and executive-related problems.  She suffers from depression and is vulnerable to manipulation and exploitation.  Dr. Sewick stated that appellant's cognitive deficits have rendered her unemployable.

{¶ 9}  According to Dr. Amy Ruschulte, appellant's primary care physician, appellant suffers from endocrine issues including panhypopituitarism, hypothyroidism, diabetes insipidus (an inability to concentrate urine), and corticoadrenal insufficiency, all of which are treatable to some extent through medications.  In addition to her depression and weight issues, she has knee pain and mobility issues, and is at risk to develop other conditions including diabetes mellitus and hypertension.  Dr. Ruschulte has observed appellant's cognitive problems and her unusual irritability and anger.

{¶ 10} Following the damages trial, the Court of Claims found that appellant's weight gain, hyperphagia, hypothalamic, pituitary and endocrine problems were not caused by the delay in treatment for which appellee was liable, but, rather, resulted from the surgery itself.  The Court of Claims did conclude that appellant suffered brain damage resulting in permanent cognitive impairment affecting her executive and motor functions and language-related capacities.  The Court of Claims awarded appellant $1,120,000 to

fund a life-care plan, $1,200,000 for lost wages and earning capacity, $236,000 for loss of services, and $250,000 in non-economic damages for pain and suffering.

## II.  ASSIGNMENTS OF ERROR

{¶ 11} Appellant makes the following assignments of error in her appeal of the judgment on damages:

> [I.] THE TRIAL COURT ERRED TO THE PREJUDICE OF THE APPELLANTS [sic] IN ACCEPTING AND BASING THE JUDGMENT ON INCOMPETENT EVIDENCE.
>
> [II.] THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT IN BASING ITS JUDGMENT ON INCOM-PETENT EVIDENCE.
>
> [III.] THE TRIAL COURT ERRED TO THE PREJUDICE OF THE APPELLANTS [sic] IN ERRONEOUSLY MISINTER-PRETTING [sic] THE TESTIMONY OF THE LIFE CARE PLANNERS AND ACCEPTING INCOMPETENT EVIDENCE.
>
> [IV.] THE TRIAL COURT ERRED TO THE PREJUDICE OF THE APPELLANTS [sic] IN ERRONEOUSLY FINDING PLAINTIFF HAD A REDUCED LIFE EXPECTANCY OF 14 YEARS WHICH WAS NOT SUPPORTED BY COMPETENT EVIDENCE.
>
> [V.] THE TRIAL COURT ERRED TO THE PREJUDICE OF THE APPELLANTS [sic] IN DENYING PLAINTIFF FULL RECOVERY OF "LOST WAGES."
>
> [VI.] THE TRIAL COURT ERRED TO THE PREJUDICE OF THE APPELLANTS [sic] IN DENYING PLAINTIFF FULL RECOVERY OF "LOSS OF SERVICES."
>
> [VII.] THE TRIAL COURT ERRED TO THE PREJUDICE OF THE APPELLANTS [sic] IN FAILING TO AWARD ADEQUATE DAMAGES CONTRARY TO LAW AND AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
>
> [VIII.] THE TRIAL COURT ERRED TO [THE] PREJUDICE OF APPELLANTS [sic] BY ABUSING ITS DISCRETION AND DEMONSTRATED A PREVAILING BIAS THROUGHOUT THIS TRIAL.

## III.  STANDARD OF REVIEW

{¶ 12} "Appellate courts review an award of damages under a manifest-weight-of-the-evidence standard." *Alternatives Unlimited-Special, Inc. v. Ohio Dept. of Edn.*, 10th

Dist. No. 12AP-647, 2013-Ohio-3890, ¶ 35.　"[I]n reviewing a judgment under the manifest-weight standard, a court of appeals weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way." *Brown v. Dept. of Rehab. & Corr.*, 10th Dist. No. 13AP-804, 2014-Ohio-1810, ¶ 19.

{¶ 13} "In undertaking this limited reweighing of the evidence, however, we are guided by the presumption that the factual findings of the trial court were correct." *Sparre v. Ohio Dept. of Transp.*, 10th Dist. No. 12AP-381, 2013-Ohio-4153, ¶ 12. "Accordingly, the weight to be given the evidence and the credibility of the witnesses are primarily questions to be answered by the trier of fact." *Id.*　The rationale for this deference is that the trier of fact is in the best position to view witnesses and observe their demeanor, voice inflections, and gestures.　*Id.*, citing *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984).

{¶ 14} We stated in *Staley v. Allstate Property Cas. Ins. Co.*, 10th Dist. No. 12AP-1085, 2013-Ohio-3424, ¶ 11:

> In order to set aside a damage award as inadequate and against the manifest weight of the evidence, a reviewing court must determine that the verdict is so gross as to shock the sense of justice and fairness, cannot be reconciled with the undisputed evidence in the case, or is the result of an apparent failure by the jury to include all the items of damage making up the plaintiff's claim. *Bailey v. Allberry*, 88 Ohio App.3d 432, 435, 624 N.E.2d 279 (2d Dist.1993).

{¶ 15} An appellate court cannot reverse the judgment of the trial court if that judgment is supported by competent, credible evidence.　*C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279 (1978), syllabus.　"However, if the judgment is against the manifest weight of the evidence and is so grossly inadequate that it shocks the conscience and constitutes an abuse of discretion, this court cannot allow the judgment to remain undisturbed." *O'Neil v. State*, 13 Ohio App.3d 320, 321 (10th Dist.1984).

## IV.　LIFE-CARE PLAN

{¶ 16} The first four assignments of error challenge the award of $1,120,000 for a life-care plan, structured to pay appellant $80,000 annually over 14 years.　The arguments in appellant's first and third assignments of error involve many of the same factual and legal issues, and we consider them together.

{¶ 17} The Court of Claims awarded $80,000 per year after finding appellee's life-care planning expert, Dorene Spak, more persuasive than appellant's. In the Court of Claims' view, Spak's plan for live-in home care, rather than placement in an assisted living facility, was "consistent with the reality of the previous 20 years of care that [her sisters] have provided to plaintiff." (Decision, 8.) Spak's original plan and report identified two care providers and three care options using the providers' services. Spak gave two options, A and B, for 24-hour care and a third option C based on 8 hours of daily care from an attendant, even though she did not believe this option was good for appellant. The Court of Claims rejected Spak's provision of $27,500 annually for aquatic therapy; it was unconvinced that appellant's weight and knee problems were related to her cognitive deficiencies. The Court of Claims further stated:

> After revising her report to eliminate compensation for plaintiff's endocrine issues and aquatic therapy, Spak estimated that option A would cost $81,000 per year; option B: $120,000 per year; and option C: $80,000 per year. Inasmuch as the only difference that Spak identified between option A and option B was the rate at which each provider charges, the court finds that $80,000 is a reasonable estimate of the costs of an annual life care plan to address plaintiff's cognitive deficiencies.

(Decision, 8.)

{¶ 18} Spak's life-care plan also provided for diagnostic tests and medications. The total annual costs under each of Spak's three options originally were $133,549 for option A, $172,969 for option B, and $132,089 for option C. The reductions followed concessions from Dr. Benson that appellant's hypothalamic damage, related to her diabetes insipidus, probably was not connected to the increased intracranial pressure and could be a complication of the surgery, and that appellant's obesity was related to a hypothalamic disorder. Dr. Barrash also agreed that appellant's hyperphagia and weight gain were consequences of the resection surgery itself. He concurred that appellant would have pituitary and endocrine problems after the resection surgery regardless of the increased intracranial pressure.

{¶ 19} At trial, appellant's life-care planning expert, Marianne Boeing, revised her plan, which entailed an assisted living facility with increasing attendant care as appellant

becomes older, to exclude care for endocrine-related issues. On direct examination, Spak was asked to do the same. She responded:

> I'm winging it here. But if I would look at this roughly, if I would look at medical follow-up, I would look at diagnostic tests, I would look at medications, those kinds of things, just to give a rough estimate. I would say, if I'm taking out those items, I'm probably about $25,000 a year too high. That's just a rough estimate.

(Tr. Vol. V, 658.) She "would think" to eliminate visits with an endocrinologist ($393), thyroid profile testing ($451), insulin growth factor testing ($208), cortisol levels testing ($240), and human growth hormone level testing ($148). (Tr. Vol. V, 659.) Later in her testimony, she estimated a $14,000 to $15,000 reduction in medication costs.

{¶ 20} These items account at most for $16,440 of Spak's $25,000 estimated total reduction, which the Court of Claims apparently subtracted, along with the $27,500 aquatic therapy cost, from each of Spak's options. Although it noted the providers' rates as the sole difference between Spak's options A and B, the Court of Claims' $80,000 annual award matches its rounded estimate for option C, which Spak believed was not appropriate.

{¶ 21} The offhanded manner of Spak's $25,000 reduction, and the Court of Claims' use of that "rough estimate" to arrive at a life-care plan award at the very low end of Spak's recalculated cost options, convince us that the Court of Claims' award of $80,000 per year was not supported by competent, credible evidence. "[A] trial court's discretion in admitting expert-opinion testimony concerning future damages requires that the court 'keep such extrapolations within reasonable bounds and insure that they conform to the evidence.' " *Marzullo v. J.D. Pavement Maint.*, 8th Dist. No. 96221, 2011-Ohio-6261, ¶ 6, quoting *Bach v. Penn Cent. Transp. Co.*, 502 F.2d 1117, 1122 (6th Cir.1974). The reduction effectively lowered the range of compensable future medical expenses without competent support.

{¶ 22} A plaintiff may not obtain future damages based on a mere guess or speculation; there must be some data on which a reasonable estimate of future expenses can be based. *See Hohn v. Ohio Dept. of Mental Retardation & Dev. Disabilities*, 10th Dist. No. 93AP-106 (Dec. 14, 1993); *Powell v. Montgomery*, 27 Ohio App.2d 112, 120 (4th Dist.1971). By the same token, the Court of Claims needed some data beyond Spak's

"rough estimate" to provide a sound basis for lowering the evidential floor for an award of future expenses. Without such competent evidence, we find the judgment incorporating an annual life-care plan award at the very bottom of the new and erroneously undervalued range to be against the manifest weight of the evidence, grossly inadequate so as to "shock the conscience," and to constitute an abuse of discretion.

{¶ 23} Despite appellant's arguments to the contrary, we find no error in the Court of Claims' preference for Spak's plan for in-home care over Boeing's projections for assisted living augmented by services of an attendant. The Court of Claims did not have to accept appellant's categorical assertion that her "disability is multifactorial, intertwined and cannot be separated." (Appellant's Brief, 20.) However, the Court of Claims should not have ruled out the aquatic therapy recommended even by Spak, appellee's expert, and other treatment for her left knee and side weaknesses. These items should have been considered by the Court of Claims in calculating an award for appellant's life-care plan. Evidence of damage to appellant's executive functioning abilities as a result of the increased intracranial pressure (due to appellee's liability) included her special need for supervision and assistance in physical activities that could help address the inevitable endocrinal and obesity issues.

{¶ 24} That she would have had weight gain as a result of the surgery is not the central issue in determining whether she should receive compensation for related, increased care. Because appellant lost the executive functioning skills that she could have otherwise utilized to deal with these conditions, she is entitled to compensation for the cost of necessary additional assistance due to losing executive function, skills she would otherwise possess to help her overcome the expected problems and complications of the surgery, notwithstanding appellee's negligence. The Court of Claims' calculation of annual future expenses was contrary to the weight of the evidence, and we therefore sustain appellant's first and third assignments of error, except that the first and third assignments of error are overruled as they relate to the reduction for aquatic therapy and other treatment for appellant's left knee and side weaknesses, based on the dissents by the other two panel members on these particular issues.

{¶ 25} The second assignment of error attacks Spak's competency and qualifications to give expert testimony. Appellant did not object to or move to strike Spak's testimony at the time of trial. The written report containing her life-care plan was

admitted into evidence without objection. Any errors predicated on her qualifications to testify as an expert are deemed to have been waived and cannot be raised for the first time on appeal. *See* Evid.R. 103(A)(1). Except when she admittedly was "winging it" to back out medication costs on the spot, we cannot conclude that Spak's testimony is so lacking in credibility that it should be given no weight. *See Deyo v. Adjutant General's Dept.*, 10th Dist. No. 93API12-1667 (Aug. 16, 1994). We unanimously overrule the second assignment of error.

{¶ 26} In her fourth assignment of error, appellant contends that the Court of Claims erred in finding only a 14-year life expectancy. This estimate, again, was at the very bottom of the range proposed by the defense expert. For his testimony on life expectancy, Dr. Steven Day reviewed the medical records and expert reports, and also medical literature on mortality rates and life expectancy for people with relevant conditions including craniopharyngioma, brain injury, obesity, chronic depression, panhypopituitarism, and growth hormone deficiency. Adjusting for these conditions, he opined that the 55-year-old appellant had a life expectancy of 14 to 18 years.

{¶ 27} Dr. Day referred to specific studies showing mortality rates for adults having undergone treatment for craniopharyngioma to be three to nine times higher than average. He performed one life expectancy calculation using the midpoint mortality rate of six times normal, and found appellant's life expectancy to be 14 years. In a separate calculation[1] adjusting for brain injury, obesity, and depression, he found a life expectancy approximating 18 years.

{¶ 28} The Court of Claims adjudged that Dr. Day had testified credibly to a reduced life expectancy on account of appellant's medical conditions. The Court of Claims rejected appellant's contention that the testimony of her primary care physician, Dr. Ruschulte, required a finding that appellant had a full life expectancy. We acknowledge that Dr. Ruschulte, with her continued contact with appellant as her primary care doctor, was not an expert on life expectancy, nor did she consult medical literature or perform research on the subject. In fact, she offered no opinion on appellant's life expectancy. Dr. Ruschulte did testify, however, that appellant's obesity could decrease her life expectancy.

---

[1] Dr. Day did not perform a life expectancy calculation adjusting for all of appellant's medical conditions at once because he recognized some overlap in them. For instance, people with craniopharyngioma often have some brain damage from resection surgery, panhypopituitarism, and weight problems.

{¶ 29} Appellant cites the efforts to impeach Dr. Day's credibility at trial: consulting mostly for defendants; Court of Claims' exclusion of testimony by two former colleagues; matters in which his own testimony was precluded; and reference to medical literature addressing diabetes mellitus (which appellant does not have) in relation to depression (from which she does suffer). She disputes Dr. Day's opinion that her lack of smoking, cardiovascular disease, hyperlipidemia, and other conditions was relatively insignificant. Among the literature Dr. Day reviewed, appellant points to one article indicating that, for people treated for craniopharyngioma, "the cause-specific late mortality after 20 years was multifactorial but rarely due to the disease progression." (Tr. Vol. V, 775.) According to Dr. Day, this does not mean that the tumor or its treatment rarely relates to cause of death, or that a recurrence is necessary to reduce life expectancy, as appellant would have it. He explained that while the condition itself rarely caused mortality, related issues such as panhypopituitarism did contribute to excess mortality. He noted that excess mortality (number of deaths caused by a specific condition) is greater for women than men who had been treated for craniopharyngioma. Rather than specifically adjusting for gender or related risk factors in his calculations, Dr. Day utilized the midpoint of excess mortality rates across combined male and female populations with a history of treatment in order to arrive at the lower bound (14 years) on his estimated range-of-life expectancy.

{¶ 30} Based on this testimony, the Court of Claims found credible Dr. Day's opinion that, to a reasonable degree of professional certainty, appellant's life expectancy was between 14 and 18 years from her current age. "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, at ¶ 21. Dr. Day provided substantial credible support for his opinion on appellant's life expectancy, and the Court of Claims' finding of a 14-year life expectancy was within the bounds of the evidence and its sound discretion.

{¶ 31} Appellant further argues that the Court of Claims' 14-year life expectancy finding was error because it was based on Dr. Day's opinion on probability of life expectancy being expressed in terms of an average life expectancy, in appellant's case calculated to be a 14 to 18-year range. In *Stinson v. England*, 69 Ohio St.3d 451 (1994),

paragraph one of the syllabus, "probab[ility]" was described as "a greater than fifty percent likelihood that it produce[s] the occurrence at issue."

{¶ 32} We note that appellant's expert economist, Dr. Harvey Rosen, also rendered an opinion according to an average life expectancy (albeit with no discount for appellant's health issues) based on the 2008 United States Life Tables. We note that appellant did not object to the admission of either Dr. Day's testimony or his report at trial, and, thus, she has waived the argument. To preserve error for appellate review, a party must make a timely objection to the admission of evidence and state the specific ground of the objection if not otherwise apparent from the context of the testimony. Evid.R. 103(A)(1). "Failure to object waives any error, other than plain error, on appeal." *Fields v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 13AP-1079, 2014-Ohio-3207, ¶ 27. *See also Craft Builders v. McCloud*, 10th Dist. No. 96APE05-716 (Jan. 14, 1997); *Kluss v. Alcan Aluminum Corp.*, 106 Ohio App.3d 528, 537 (8th Dist.1995). The fourth assignment of error is overruled by unanimous decision.

## V. LOST WAGES

{¶ 33} Appellant's fifth assignment of error addresses the Court of Claims' award for lost wages. In addition to present-value costs of the future care recommended by Boeing for appellant, Dr. Rosen calculated appellant's lost earnings using three alternative retirement ages: 62.2 (from the Bureau of Labor Statistics tables); 65 (the "normal" retirement age); and 66 years, 8 months (age for full Social Security benefits). (Tr. Vol. III, 378.) Appellant was a university graduate with a degree in criminal justice. She had been working with the Butler County Sheriff's Department before she was employed in 1989 as the first woman corporate security manager at Procter & Gamble, where she earned $38,000 annually, plus benefits. Dr. Rosen used the Employment Cost Index published by the Bureau of Labor Statistics, indicating an average annual wage increase of 3.39 percent between 1989 and 2013, for the average worker in private industry. Due to lack of real wage growth in the previous decade, Dr. Rosen projected annual wage growth at .05 percent after 2013. He figured appellant's lost wages (including fringe benefits) at $2,414,925 to age 62.2; at $2,610,527 to age 65; and $2,792,041 to age 66 years, 8 months. He made no adjustment for appellant's $17,000 annual disability income.

{¶ 34} Appellant does not dispute the Court of Claims' holding that disability pay must be offset as a collateral source benefit under R.C. 3345.40(B)(2). The Court of Claims found a work-life expectancy of 62 years and rejected annual wage increases:

> Given that plaintiff had only worked at Proctor and Gamble for a little more than a year, the court cannot conclude that plaintiff's salary would have continued to increase at such a rate into the future. Simply put, plaintiff's limited wage history at Proctor and Gamble does not support an assumption of annual wage increases.

(Decision, 10.)

{¶ 35} According to the Court of Claims, the award of $1,200,000 for lost wages and lost earning capacity "includes a reduction for plaintiff's $17,000 annual disability payment[2] and an adjustment to Rosen's unrealistic wage growth percentages." (Decision, 10.) The Court of Claims found that appellant would have been employed from the time of her injury when she was nearly age 33 until age 62, but it rejected Dr. Rosen's projected growth rate on the sole basis that she "had only worked at Proctor and Gamble for a little more than a year." (Decision, 10.)

{¶ 36} The Court of Claims had before it no evidence contra the Employment Cost Index on which Dr. Rosen relied to arrive at the 3.39 percent average annual growth rate through 2013. The Court of Claims' award was less than the amount of $1,313,513 Dr. Rosen had calculated through 2012 for lost wages alone and far less than his projection of $1,885,499 to 2020, when appellant turns 62. The decision of the Court of Claims gives no consideration to legally required payments, including Social Security contributions and fringe benefits, such as appellant's employer's health insurance and profit-sharing contributions.

> "An award of future damages for future wage loss raises two independent evidentiary concerns: (1) whether a plaintiff offered sufficient proof of future impairment; and (2) whether a plaintiff offered sufficient evidence of the extent of prospective damages flowing from the impairment." *Power v. Kirkpatrick* (July 20, 2000), Franklin App. No. 99AP-1026. To recover future earnings, a plaintiff must prove by sufficient

---

[2] This collateral source benefit was properly deducted from the award against the university under R.C. 3345.40(B)(2). *See Aubry v. Univ. of Toledo Med. Ctr.*, 10th Dist. No. 11AP-509, 2012-Ohio-1313, ¶ 20-22 (recognizing financial assistance received in time of disability either from insurance or public programs as "benefits" to be setoff from any award against state university or college).

> evidence that she is reasonably certain to incur such damages in the future. *Id.*, citing *Galayda v. Lake Hosp. Sys., Inc.* (1994), 71 Ohio St.3d 421, 644 N.E.2d 298.

*Marzullo v. J.D. Pavement Maintenance*, 8th Dist. No. 96221, 2011-Ohio-6261, ¶ 17.

{¶ 37} This court stated in *Miller v. State*, 10th Dist. No. 13AP-849, 2014-Ohio-3738, ¶ 78:

> "Predictions about future-earning capacity are necessarily somewhat speculative." *Adae v. State*, 10th Dist. No. 12AP-406, 2013-Ohio-23, ¶ 39, citing *Andler v. Clear Channel Broadcasting, Inc.*, 670 F.3d 717, 726 (6th Cir.2012), citing *Eastman v. Stanley Works*, 180 Ohio App.3d 844, 907 N.E.2d 768, 2009-Ohio-634 (10th Dist.). "An exact calculation of what the plaintiff could have earned but for her injury is not required; the plaintiff must prove damages with reasonable certainty." *Id.*, citing *Andler* at 726, *Eastman* at ¶ 24.

{¶ 38} "When calculating earning capacity, experts often consult actuarial tables, Bureau of Labor Statistics figures or other averages along with the plaintiff's historical earnings." *Id.* at ¶ 79, citing *Andler v. Clear Channel Broadcasting, Inc.*, 670 F.3d 717, 728 (6th Cir.2012), and *Taylor v. Freedom Arms, Inc.*, 5th Dist. No. CT2008-0071, 2009-Ohio-6091, ¶ 16.

{¶ 39} We note that appellee provides significant argument to reject Dr. Rosen's opinion on appellee's projected earnings entirely, but it does not separately cross-appeal on this issue. We address appellee's argument nonetheless. There is no requirement, as appellee suggests, that the expert's calculations be "strictly tailored" to the plaintiff. (Tr. Vol. III, 423.) We note that Dr. Rosen did consult Procter & Gamble's medical and profit-sharing plan data and administrators for company specific benefits but did not obtain salary information for appellant's position. That the index included no specific distinctions for occupation, geographic location, or education level afforded no basis to discard Dr. Rosen's projections for not being specific enough to appellant. Nor did the mere possibilities that she or any other worker might not reach her life expectancy, could miss work due to other injury or illness, may be laid off or fired, would incur a reduction in benefits, or may not receive a pay raise at any stage militate toward a negative or positive differential from the rates applied to appellant. Appellee claims that the Court of Claims did not have any relevant evidence, testimonial, documentary or otherwise, on which to base an award of prospective lost earnings. I disagree. Moreover, the Court of

Claims' award for lost wages, without a sound basis to deny annual increases as appellant submitted through Dr. Rosen, was inadequate and against the weight of the competent and credible evidence. Since Judge Dorrian concurs in part and dissents in part to the lead opinion's view on appellant's fifth assignment of error, and Judge Sadler dissents as to the lead opinion regarding the fifth assignment of error, it is sustained as it relates to the Court of Claims' rejection of any annual wage increases, but it is overruled as to no consideration given by the Court of Claims to legally required payments.

## VI. LOSS OF SERVICES

{¶ 40} To replace household services appellant could no longer provide to herself, Dr. Rosen calculated costs through the end of appellant's life, assuming she had a normal life expectancy. In its decision, the Court of Claims stated:

> On cross-examination, Rosen calculated the cost of replacing such services using the minimum wage plus legally required benefits. Rosen concluded that such a cost would be $540,000, about half of which would represent the cost of household services from 1990 up to the present. However, the court has previously determined that plaintiff's life expectancy is 14 years rather than the "normal" life expectancy that Rosen used. Additionally, if plaintiff enters an assisted living facility, such services will be included in the cost of the facility. Moreover, plaintiff is attempting to recover for services that [her sisters] have provided to plaintiff since 1990. Accordingly, the court finds that $236,000 is a reasonable award for loss of services.

(Decision, 11.)

{¶ 41} $236,000 is the amount Dr. Rosen estimated on cross-examination when he was asked to calculate the value of past household services, as she would have provided or as her sisters did for her,[3] at $10 per hour, reflecting minimum wage plus legally required benefits. Dr. Rosen's valuation of household services from 1991 through 2013

---

[3] The tortfeasor is responsible for the reasonable value of nursing services or other care, regardless of who provides it and even though it was rendered gratuitously and as a result of moral obligation; the appropriate measure of damages is the economic value of the care provided. *Hutchings v. Childress*, 119 Ohio St.3d 486, 2008-Ohio-4568, ¶ 30, 39-41; *White v. Bannerman*, 5th Dist. No. 2009CA00221, 2010-Ohio-4846, ¶ 91-93; *Howard v. McKitrick*, 10th Dist. No. 87AP-148 (July 2, 1987).

was $354,159; those services would stop if appellant entered an assisted living facility in accordance with Boeing's life-care plan.[4]

{¶ 42} But the Court of Claims rejected Boeing's plan and adopted Spak's option for in-home care instead of an assisted living facility. The Court of Claims' suggestion that entering an assisted living facility would obviate additional expenses for household services is inconsistent with its decision on appellant's life-care plan. Other than Boeing's acknowledgment that an attendant would do some of the housekeeping, the evidence does not support appellee's position that household services, including laundry and cleaning windows, would be covered under the home care option. The Court of Claims did not find that Dr. Rosen's valuation of these prospective costs was duplicative, but referred only to its prior determination that appellant's life expectancy was "14 years rather than the 'normal' life expectancy that Rosen used." (Decision, 11.) The Court of Claims' apparent conflation of household services with medical, nursing, and other health related care the parties presented in alternative life-care plans unreasonably foreclosed an award for future household services. Therefore, we unanimously sustain appellant's sixth assignment of error.

## VII. NON-ECONOMIC DAMAGES

{¶ 43} Appellant's seventh assignment of error recapitulates her arguments over the inadequacy of the damages awarded and highlights both Boeing's and Spak's provisions for socialization and transportation in their respective life-care plans. To the extent we have sustained the points we have found well-taken in assignments of error one, three, five, and six, we sustain the seventh assignment of error also. Otherwise, we overrule it. Specifically, we overrule appellant's arguments that error exists relating to the constitutionality of R.C. 3345.40.

{¶ 44} Appellant argues that the Court of Claims awarded no damages for loss of enjoyment of life. Appellant received the maximum award of $250,000 in non-economic damages for pain and suffering. Under R.C. 3345.40(B)(3), the Court of Claims was not permitted to award any greater sum against appellee, a state university, for non-

---

[4] These calculations were based on Bureau of Labor Statistics data indicating 2.53 hours per day on average for household services by an employed woman with no children, and 3.6 hours after retirement. After retirement, that figure increases to 3.6 hours per day. Dr. Rosen used a "normal" life expectancy of 28 years and a $15 hourly rate to value total lost services at $809,196. At minimum wage plus legally required benefits, the cost to replace services from 1990 to "normal" life expectancy approximated $540,000.

compensatory damages that did not fit the definition of "actual loss" under the 1987 statute. R.C. 3345.40(A)(2)(b)(ii) provides that the calculated "actual loss" of a person awarded damages does not include "damages awarded for pain and suffering, for the loss of society, consortium, companionship, care, assistance, attention, protection, advice, guidance, counsel, instruction, training, or education of an injured person, for mental anguish, or for any other intangible loss."

{¶ 45} Making the argument for the first time in her reply brief, appellant argues the unconstitutionality of the state's statutory limitation on damages in this single, conclusory sentence: "R.C. 3345.40 is clearly unconstitutional under the Ohio and U.S. Constitutions denying due process, open courts and equal protection." (Appellant's Reply Brief, 18.) We need not address this new argument in appellant's reply brief for whatever point it may raise.[5] *State ex rel. Grounds v. Hocking Cty. Bd. of Elections*, 117 Ohio St.3d 116, 2008-Ohio-566, ¶ 24, citing *Hoskins v. Simones*, 173 Ohio App.3d 186, 2007-Ohio-4084, ¶ 38 (2d Dist.); *Whitehall v. Olander*, 10th Dist. No. 14AP-6, 2014-Ohio-4066, ¶ 46, citing *Huffer v. Brown*, 10th Dist. No. 12AP-1086, 2013-Ohio-4384, ¶ 10.

{¶ 46} Furthermore, "[p]ursuant to App.R. 12(A)(1)(b), appellate courts must '[d]etermine [an] appeal on its merits on the assignments of error set forth in the briefs under App.R. 16.' Thus, generally, appellate courts will rule only on assignments of error, not mere arguments." *Camp v. Star Leasing Co.*, 10th Dist. No. 11AP-977, 2012-Ohio-3650, ¶ 69, citing *Thompson v. Thompson*, 196 Ohio App.3d 764, 2011-Ohio-6286, ¶ 65 (10th Dist.). Had the matter been raised specifically by assignment of error, appellant would have had to carry her burden of affirmatively demonstrating the error and substantiating the supporting arguments. *Camp* at ¶ 67, citing App.R. 16(A)(7). "It is not the duty of this court to construct legal arguments in support of an appellant's appeal." *Id.*, citing *Proctor v. Ohio Civ. Rights Comm.*, 169 Ohio App.3d 527, 2006-Ohio-6007, ¶ 16 (9th Dist.), and *State ex rel. Petro v. Gold*, 166 Ohio App.3d 371, 2006-Ohio-943,

---

[5] In her written closing argument in the Court of Claims, appellant stated that R.C. 3345.40 was unconstitutional because the damages cap did not include "any adjustment for inflation or time." (R. 181, at 22.) "It is well-settled that 'where constitutional arguments are not raised, argued and ruled upon by the trial court, reviewing courts should not entertain such arguments for the first time on appeal.' " *Atlantic Mtge. & Invest. Corp. v. Sayers*, 11th Dist. No. 2000-A-0081 (Mar. 1, 2002), quoting *In re Vickers Children*, 14 Ohio App.3d 201, 202 (12th Dist.1983). Neither have we any indication of plain error or rights and interests sufficient to warrant consideration of any constitutional challenge, let alone one raised at the last possible juncture and without explication. *Compare In re M.D.*, 38 Ohio St.3d 149, 151 (1988) ("due process considerations of appellant's arguments are apparent, and sufficient to avoid the waiver issue").

¶ 94 (10th Dist.).   "Appellant's bare assertion is insufficient to meet her burden of establishing error."  *Proctor* at ¶ 16.

## VIII.  CLAIM OF JUDICIAL BIAS

{¶ 47} In her eighth assignment of error, appellant charges the Court of Claims with bias and abuse of discretion, and proceeds to recite a number of rulings against her without any particular legal argument as would be made concerning an assignment of error.

{¶ 48} Appellant argues that "all of the numbers accepted by the court were those of defense witnesses; none of which took into consideration any economic inflation or reduction to present value."  (Appellant's Brief, 54.)  (We note that the Court of Claims derived its award for loss of services from appellant's witness, Dr. Rosen, upon cross-examination.)  Appellant argues that the Court of Claims' view that her evidence of increased cost of future medical care was highly speculative and not reasonably reliable is error.  However, it is axiomatic that "[c]omparison of expert witnesses' professional stature and the weight of the experts' testimony are for the trier of the facts."  *McQueen v. Goldey*, 20 Ohio App.3d 41, 48 (12th Dist.1984), paragraph six of the syllabus.

{¶ 49} Appellant also objects that the Court of Claims admitted expert testimony by Dr. Van Loveren in his videotaped deposition without a prior written report; denied appellant's proffer of a transcribed conversation between Dr. Van Loveren and appellant's sisters; and later struck the transcription from the record when appellant filed it without leave of court.  The Court of Claims ultimately did not rely on or adopt Dr. Van Loveren's opinion that appellant had no intracranial pressure on December 24, 1990.  Therefore, we find no harmful error regarding these interlocutory rulings, notwithstanding appellant's failure to assign error properly in the first instance.  Civ.R. 61.

{¶ 50} Contrary to appellant's position, Dr. Day did not give testimony on any medical issues but simply was asked whether certain medical conditions were considered in his morbidity analyses.  Appellant provides no authority or reason to prevent appellee from extracting the potentially non-compensable items through examination at trial, as far as the related proofs may warrant.  We have sustained the first and third assignments of error to the extent we found this "deconstruction" to be against the weight of the evidence.  Appellant urges bias in the Court of Claims' decision, the interlocutory rulings previously mentioned, the denial of leave to file a reply brief regarding pre-judgment

interest, and the Court of Claims' declining to rule on appellant's motions for judgment notwithstanding the verdict, for a new trial, and for relief from judgment prior to this court dismissing her initial appeal as premature. Appellant also asserts bias as to the Court of Claims' adverse evidentiary rulings, this point having been added in her reply brief and which we decline to further delineate.

{¶ 51} Without proper assignments of error or legal explication, we find appellant identifies no abuse of discretion to justify reversal beyond what we have already decided. "Pursuant to R.C. 2701.03, only the chief justice of the Supreme Court of Ohio or his or her designee has the authority to determine a claim that a common pleas court judge is biased or prejudiced." *Stanley v. Ohio State Univ. Med. Ctr.*, 10th Dist. No. 12AP-999, 2013-Ohio-5140, ¶ 94. Effective July 10, 2014, R.C. 2701.03 was extended to the Court of Claims. 2014 Am.Sub.H.B. No. 261. The statute would foreclose our consideration of judicial bias if this appeal had not been filed and briefed before then. In any event, as in *Stanley* we conclude that "appellant has failed to overcome the presumption of lawfulness and impartiality in the trial judge's participation in this case." *Id.* at ¶ 100.

{¶ 52} "Judicial bias has been described as 'a hostile feeling or spirit of ill will or undue friendship or favoritism toward one of the litigants or his attorney, with the formation of a fixed anticipatory judgment on the part of the judge, as contradistinguished from an open state of mind which will be governed by the law and the facts.' " *State v. Dean*, 127 Ohio St.3d 140, 2010-Ohio-5070, ¶ 48, quoting *State ex rel. Pratt v. Weygandt*, 164 Ohio St. 463 (1956), paragraph four of the syllabus.

{¶ 53} "A judge is presumed not to be biased or prejudiced, and a party alleging bias or prejudice must present evidence to overcome the presumption." *Wardeh v. Altabchi*, 10th Dist. No. 03AP-1177, 2004-Ohio-4423, ¶ 20. "The appearance of bias or prejudice must be compelling to overcome this presumption of integrity." *Trott v. Trott*, 10th Dist. No. 01AP-852 (Mar. 14, 2002), citing *In re Disqualification of Olivito*, 74 Ohio St.3d 1261, 1263 (1994). " 'The existence of prejudice or bias against a party is a matter that is particularly within the knowledge and reflection of each individual judge and is difficult to question unless the judge specifically verbalizes personal bias or prejudice toward a party.' " *Eller v. Wendy's Internatl., Inc.*, 142 Ohio App.3d 321, 340 (10th Dist.2000), quoting *Okocha v. Fehrenbacher*, 101 Ohio App.3d 309, 322 (8th Dist.1995). "[D]issatisfaction or disagreement with a judge's rulings of law are legal issues subject to

appeal. A judge's opinions of law, even if later found to be erroneous, are not by themselves evidence of bias or prejudice and thus are not grounds for disqualification." *In re Disqualification of Corts*, 47 Ohio St.3d 601, 602 (1988).

{¶ 54} Appellant provides a litany of adverse rulings to support her claim of bias or prejudice but without explaining how they assist in overcoming the presumption of bias for any particular allegation. Further, the record does not disclose on its face suggestions of hostility, favoritism, or a fixed anticipatory judgment. "Appellant's unsubstantiated accusations of improper conduct are insufficient to overcome the presumption of judicial integrity." *Cline v. Mtge. Electronic Registration Sys., Inc.*, 10th Dist. No. 13AP-240, 2013-Ohio-5706, ¶ 33, citing *Cooke v. United Dairy Farmers, Inc.*, 10th Dist. No. 05AP-1307, 2006-Ohio-4365. Accordingly, we unanimously overrule the eighth assignment of error.

## IX. MOTION AND REMAND

{¶ 55} After oral argument, appellant filed a "motion to clarify relief" and basically asked for entry of judgment in the amount of $10,742,610, pursuant to App.R. 12(B) and (C). Section (B) does not apply because we have not found that appellant is entitled to have judgment rendered in her favor "as a matter of law." App.R. 12(C)(1) states:

> In any civil action or proceeding that was tried to the trial court without the intervention of a jury, and when upon appeal a majority of the judges hearing the appeal find that the judgment or final order rendered by the trial court is against the manifest weight of the evidence and have not found any other prejudicial error of the trial court in any of the particulars assigned and argued in the appellant's brief, and have not found that the appellee is entitled to judgment or final order as a matter of law, the court of appeals shall reverse the judgment or final order of the trial court and either weigh the evidence in the record and render the judgment or final order that the trial court should have rendered on that evidence or remand the case to the trial court for further proceedings.

{¶ 56} As stated at the outset, we have elected to remand the matter to the Court of Claims for further proceedings. We do not agree with appellant that "the only 'reasonable' and competent evidence justifies a verdict of $10,742,610." (Appellant's Motion to Clarify Relief, 2.) In her reply brief, appellant had submitted a "minimum total" award of $5,974,991.91. (Appellant's Reply Brief, 20.) We leave it to the Court of Claims to

exercise its discretion to "take additional testimony, amend findings of fact and conclusions of law or make new findings and conclusions, and enter a new judgment." Civ.R. 59(A); *Behrend v. State*, 10th Dist. No. 78AP-575 (Feb. 22, 1979).

{¶ 57} Since appellee has not appealed the judgment of liability and we have affirmed the award of non-economic damages, those portions of the judgment stand, and proceedings on remand are limited to economic damages. "App.R. 12(D), in conjunction with Civ.R. 42(B), authorizes a Court of Appeals to order the retrial of only those issues, claims or defenses the original trial of which resulted in prejudicial error, and to allow issues tried free from error to stand." *Mast v. Doctor's Hosp. N.*, 46 Ohio St.2d 539, 541 (1976). "New trials on the issue of damages only are granted when liability is uncontested, clear, affirmatively established or supported by the weight of the evidence." *Harper v. Lefkowitz*, 10th Dist. No. 09AP-1090, 2010-Ohio-6527, ¶ 36.

{¶ 58} We unanimously deny appellant's "motion to clarify relief," and we remand the matter to the Court of Claims for further proceedings as set forth in the judgment entry.

## X. CONCLUSION

{¶ 59} In consideration of the separate opinions within this plurality decision offering concurring and dissenting points of view, we issue the following unified conclusions as to appellant's eight assignments of error.

{¶ 60} We unanimously overrule the second, fourth, and eighth assignments of error and affirm the decision of the Court of Claims as to these assignments of error.

{¶ 61} We unanimously sustain appellant's sixth assignment of error and reverse the decision of the Court of Claims.

{¶ 62} By majorities comprised of differing panel members, we sustain in part and overrule in part the first and third assignments of error. Specifically, we sustain the first and third assignments of error as to the Court of Claims' annual life-care plan award in the same amount as Spak's reduced option C, and its reduction of damages by $25,000 annually for endocrine-related items, thereby reversing the decision of the Court of Claims as to these issues and remanding these issues for further proceedings consistent with this plurality decision. We overrule those portions of the first and third assignments of error as to reduction for aquatic therapy and other treatment for appellant's left knee

and side weaknesses, thereby affirming the decision of the Court of Claims as to these matters.

{¶ 63} By majorities comprised of differing panel members, we sustain in part and overrule in part the fifth assignment of error. More specifically, we sustain the fifth assignment of error as to the Court of Claims' rejection of annual wage increases, reversing its decision on this issue and remanding it for further proceedings consistent with this plurality decision. We overrule the remainder of the fifth assignment of error concerning whether the Court of Claims gave consideration to legally required payments, and we affirm the decision of the Court of Claims on this issue contained within the fifth assignment of error.

{¶ 64} We overrule appellant's seventh assignment of error as to the argument that error exists relating to the constitutionality of R.C. 3345.40.

{¶ 65} We unanimously sustain that portion of the seventh assignment of error that the Court of Claims failed to award adequate damages, and we do so to the extent that we have sustained the first, third, fifth, and sixth assignments of error concerning the adequacy of damages awarded for loss of services. Accordingly, we hereby reverse the decision of the Court of Claims on the seventh assignment of error as to adequate damages as described herein, thereby reversing the decision of the Court of Claims as to this issue and remanding it for further proceedings consistent with this plurality decision.

{¶ 66} Finally, we unanimously overrule appellant's motion to clarify relief.

*Judgment affirmed in part, reversed in part,*
*and cause remanded per this plurality decision.*

SADLER, J., concurs in part and dissents in part.
DORRIAN, J., concurs in part and dissents in part.

SADLER, J., concurring in part and dissenting in part.

{¶ 67} I agree with the lead opinion in denying appellant's motion to clarify relief and overruling appellant's second, fourth, and eighth assignments of error and in sustaining appellant's sixth assignment of error. I also agree with the lead opinion in overruling in part and sustaining in part appellant's seventh assignment of error; however, I would only sustain the seventh assignment of error to the extent we sustained the sixth assignment of error. Accordingly, I concur in part.

{¶ 68} In light of Spak's status as a credible expert on life-care plans, as the lead opinion indicates in the second assignment of error, and because I believe record evidence supports the award of damages as stated by the Court of Claims, I disagree with the lead opinion's decision to sustain appellant's first and third assignments of error.   I additionally disagree with the lead opinion's decision to sustain appellant's fifth assignment of error because I believe the Court of Claims acted within its discretion to not assume wage growth under the facts of this case.  For these reasons, I respectfully dissent in part.

### Appellant's First Assignment of Error

{¶ 69}  In her first assignment of error, appellant contends that the Court of Claims erred when it based its judgment on incompetent evidence.  Specifically, appellant challenges the factual foundations of Spak's life-care plan report as well as Spak's testimony offering a "rough estimate" of a life-care plan revised to omit those items not caused by appellee's delay in treatment.  (Tr. 658.)  Finally, appellant asserts the Court of Claims acted unjustly by selecting "option C," providing for eight-hour care, where all experts agreed appellant requires 24/7 care.  (Decision, 8.)

{¶ 70} As a preliminary matter, I agree that record evidence shows appellant requires 24/7 care.  However, I do not believe the Court of Claims selected option C as the model for damages.  In its decision, the Court of Claims expressly chose between only options A and B.  In my view, the Court Claims' decision to allocate $80,000 to cover the life-care plan cost annually reflects that option A was "roughly the same cost" as option C. (Decision, 7.)  In presenting the life-care plans options, Spak repeatedly established the equivalency of options A and C, opining "[f]or the same price [as option C] you can get 24/7 care." (Tr. 654.)  Therefore, I believe the Court of Claims acted within its discretion to allocate $80,000 a year to fund a life-care plan affording 24/7 care.

{¶ 71}  Further, I believe Spak's report and testimony are credible evidence upon which the Court of Claims determined the award of damages.  As the lead opinion describes in the second assignment of error, Spak's competency and qualifications as an expert cannot, at this point, be disputed.  As such, I disagree with the lead opinion that Spak's testimony regarding an estimate of reductions, information within her personal experience and knowledge, was "so lacking in credibility" so as to hold "no weight."  (Lead Opinion, ¶ 25.)   In fact, comparing Spak and Boeing's life-care plans, Spak's $25,000

reduction estimate is verifiable and remarkably consistent with the endocrine-related reduction amounts provided in Boeing's report.  Thus, in addition to Spak's testimony, the Court of Claims did have a "sound basis for lowering the evidential floor for an award for future expenses."  (Lead Opinion, ¶ 22.)  Therefore, on this record, I believe the Court of Claims' award is not "grossly inadequate so as to 'shock the conscience.' "  (Lead Opinion, ¶ 22.)

{¶ 72} Accordingly, I would overrule appellant's first assignment of error.

**Appellant's Third Assignment of Error**

{¶ 73} In this assignment of error, appellant belies the Court of Claims' "mistaken" belief that Boeing failed to properly extract endocrine-related costs from her report and, due to this mistaken belief, preferred Spak's plan.  (Appellant's Brief, 25.)  This argument fails as against the facts.  Even in her revised report, Boeing left in major items such as a left knee replacement surgery that relate to conditions the court determined not to be compensable.   Moreover, the Court of Claims proceeded with Spak's plan for its substance, emphasizing that Spak's plan reflected care consistent with appellant's previous 20 years of care and promoted an independent lifestyle.

{¶ 74} As background to why appellant prompted Boeing to revise her report, appellant discusses the issue of what damages the intracranial pressure caused versus the surgery itself or subsequent small stroke.  Appellant asks for 24/7 care because her decreased executive function, which the delay in treatment and resulting intracranial pressure caused, affects her ability to make healthy dietary decisions and contributes to her obesity and knee problems.  As discussed in the first assignment of error, I believe the Court of Claims allowed for 24/7 care in its award of damages.  As such, the argument for 24/7 care is moot.  Additionally, since the 24/7 care option provides appellant with assistance on those endocrine issues arising out of decreased executive function, such as decision making on dietary choices and physical activity, any additional amount of damages for this purpose would be duplicative.

{¶ 75} Further, I disagree with the lead opinion's finding that the Court of Claims improperly excluded costs for appellant's left knee and side weaknesses, such as aquatic therapy.   Because I believe the record supports the Court of Claims' decision that appellee's delay in treatment did not cause the conditions underlying these costs, I believe

the Court of Claims acted within its discretion in excluding these costs from the award for damages for the life-care plan.

{¶ 76} Accordingly, for the reasons stated above, I would overrule appellant's third assignment of error.

**Appellant's Fifth Assignment of Error**

{¶ 77} In her fifth assignment of error, appellant argues that the Court of Claims erred in denying appellant full recovery of lost wages when it concluded "[appellant's] limited wage history at Proctor and Gamble does not support an assumption of annual wage increases." (Decision, 10.) The lead opinion agreed, finding that "without a sound basis to deny annual increases" reflected in the historic wage growth indexes submitted by Dr. Rosen, the Court of Claims' award for lost wages was inadequate and against the weight of competent and credible evidence. (Lead Opinion, ¶ 39.)

{¶ 78} As cited by the lead opinion, a plaintiff bears the burden of proving damages for wage loss with reasonable certainty. Here, the Court of Claims noted that appellant only had one year of salary history and did not present evidence showing she, or even someone holding her former position at Proctor and Gamble, was eligible for wage increases. Whether or not these reasons pull appellant's proof below the threshold of reasonable certainty, I believe, is arguable. As such, under review for an abuse of discretion, the Court of Claims' decision on this point should stand. Accordingly, I would overrule appellant's fifth assignment of error.

{¶ 79} For the foregoing reasons, I would overrule all but the sixth assignment of error and, correspondingly, the seventh assignment of error to the extent that it also challenges the inadequacy of damages for loss of services and remand the matter to the Court of Claims on that single issue.

DORRIAN, J., concurring in part and dissenting in part.

{¶ 80} I respectfully concur in part with the lead opinion and dissent in part with the lead opinion as follows.

{¶ 81} I concur to overrule the second, fourth, and eighth assignments of error and appellant's motion to clarify relief. I concur to sustain the sixth assignment of error.

{¶ 82} I concur in judgment only to sustain the first and third assignments of error as they relate to the Court of Claims' selection of option C and reduction of damages by

$25,000 for endocrine-related items.  I dissent, however, and would overrule the first and third assignments of error as they relate to the reduction for aquatic therapy and other treatment for appellant's left knee and side weaknesses.

{¶ 83} I concur to sustain the fifth assignment of error as it relates to the Court of Claims' rejection of any annual wage increases.  I dissent, however, as to the fifth assignment of error, as it relates to the finding that the Court of Claims' decision gives no consideration to legally required payments.  Appellant did not raise this argument in her brief, and therefore I would decline to address it.

{¶ 84} I concur to sustain the seventh assignment of error to the extent I would sustain the first, third, fifth, and sixth assignments of error consistent with this concurrence and dissent.  I concur to overrule the seventh assignment of error as it relates to the constitutionality of R.C. 3345.40.

_____